*Formatted for Electronic Distribution*                                                              *Not for Publication*

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF VERMONT



Filed & Entered
On Docket
05/08/2020

_____

**In re:**

    Springfield Medical Care Systems, Inc.,        Chapter 11 Case
        Debtor-in-Possession.                                # 19-10285
_____

**In re:**

    Springfield Medical Care Systems, Inc.,
        Plaintiff,
            v.                                                  **Adversary Proceeding**
    Jovita Carranza, in her capacity as                      **# 20-01004**
    Administrator for the U.S. Small
    Business Administration,
        Defendant.
_____

*Appearances:*  D. Sam Anderson & Adam R. Prescott      *Michael Tye*
                  *Bernstein, Shur, Sawyer & Nelson, P.A.*      *U.S. Department of Justice*
                  *Portland, ME*      *Washington, DC*
                  *For the Plaintiff*      *For the Defendant*

                  *Elizabeth A. Glynn*      *Melissa A. D. Ranaldo*
                  *Ryan Smith & Carbine, Ltd.*      *U.S. Attorney's Office – Vermont*
                  *Rutland, Vermont*      *Burlington, Vermont*
                  *For Berkshire Bank*      *For the Defendant*

## MEMORANDUM OF DECISION[1]
### GRANTING PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER

      The Plaintiff, Springfield Medical Care Systems, Inc., has filed a motion for a temporary restraining order (a "TRO") against the Defendant, Jovita Carranza, in her capacity as Administrator for the U.S. Small Business Administration. Based on the record in this case, the arguments presented at the May 6, 2020 hearing, and for the reasons set forth below, the Court grants the Plaintiff's request for a TRO based on its claim under 11 U.S.C. § 525(a).

---

[1] This memorandum overlaps significantly with the Court's ruling in Springfield Hospital, Inc., v. Carranza, 20-ap-01003, doc. # 20 (Bankr. D. Vt. May 4, 2020), as the facts, procedural history and legal arguments in the two proceedings are quite similar.

1

## JURISDICTION

This Court has jurisdiction over this adversary proceeding and the TRO Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Order of Reference entered on June 22, 2012. This decision addresses a cause of action under § 525 of the Bankruptcy Code and thus is a core proceeding arising under Title 11 of the United States Code as described in 28 U.S.C. § 157(b)(2)(A), (D), and (O). Therefore, this Court has constitutional authority to enter a final judgment in this proceeding.

## PROCEDURAL HISTORY

On April 29, 2020, the Plaintiff filed a verified complaint to commence this adversary proceeding (doc. # 1, the "Complaint") and a motion for an emergency hearing on its request for a temporary restraining order (doc. # 2, the "TRO Motion"). Pursuant to the Court's scheduling order on the TRO Motion (doc. # 6), the Defendant filed a response on May 4, 2020 (doc. # 11),[2] and the Plaintiff filed a supplemental memorandum of law on May 5, 2020 (doc. # 15).[3] The Court held an emergency hearing on the TRO Motion on May 6, 2020 and took the matter under advisement.

## ISSUES PRESENTED

The Plaintiff's Complaint includes four counts for relief: (I) preliminary and permanent injunction, (II) declaratory judgment (based on a claim that the Defendant exceeded her statutory authority), (III) determination of a violation of Bankruptcy Code § 525(a), and (IV) mandamus under 28 U.S.C. § 1361. The Plaintiff's TRO Motion (doc. # 2) asks the Court to enter a TRO, essentially, so the Plaintiff's application under the recently enacted Paycheck Protection Program (the "PPP") is considered without regard to the Plaintiff's status as a chapter 11 debtor.

As a threshold matter, the Court must determine whether the Defendant is immune from the Plaintiff's request for injunctive relief. If the Defendant is not protected by sovereign immunity, then the Court must next determine whether the Plaintiff has met its burden of establishing that a TRO is warranted based on any of the Plaintiff's prayers for relief.

## LEGAL STANDARD

The standard for entry of a TRO is the same as for a preliminary injunction. Andino v. Fischer, 555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008) (citations omitted). A party seeking a preliminary injunction must establish: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent relief; (3) that the balance of equities weighs in its favor; and (4) that an injunction is in the public interest. Metro. Life Ins. Co. v. Bucsek, 919 F.3d 184, 188, n.2 (2d Cir. 2019) (citing Winter v. NRDC, Inc., 555 U.S. 7, 20(2008)).

---

[2] On May 5, 2020, the Court granted the Defendant's stipulated motion for leave to exceed the page limit (doc. # 16).
[3] Although permitted under the scheduling order, the Defendant did not file a supplemental memorandum of law (see doc. # 6).

2

## DISCUSSION

### A. **Application of Sovereign Immunity to the Plaintiff's § 525(a) Claim**

The Court considers first the Plaintiff's prayer for relief based on the Defendant's alleged violation of the anti-discrimination provision of the Bankruptcy Code, 11 U.S.C. § 525. The Defendant alleges its sovereign immunity precludes the Court from granting the Plaintiff injunctive relief on this basis (doc. # 11, p. 2). In response, the Plaintiff points to §§ 105, 106, and 525 of the Bankruptcy Code, which it asserts abrogate the Defendant's sovereign immunity (doc. # 15, p. 4). Those sections provide, in relevant part:

> [A] governmental unit may not deny … a license, permit, charter, franchise, or other similar grant to … a person that is or has been a debtor under [the Bankruptcy Code, 11 USCS §§ 101 et seq.] …, solely because such bankrupt or debtor is or has been a debtor under [the Bankruptcy Code][.]

11 U.S.C. § 525(a).

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.

11 U.S.C. § 105(a).

> Notwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section with respect to the following:
>
> > (1) Sections 105, 106, … 525 of [the Bankruptcy Code].
> >
> > (2) The court may hear and determine any issue arising with respect to the application of such sections to governmental units.
> >
> > (3) The court may issue against a governmental unit an order, process, or judgment under such sections[.]
> >
> > (4) The enforcement of any such order, process, or judgment against any governmental unit shall be consistent with appropriate nonbankruptcy law applicable to such governmental unit[.]

11 U.S.C. § 106(a).

Together, these sections appear on their face to authorize the Court to enjoin the Defendant from taking any action this Court finds to be a violation of § 525(a). The Defendant is resolute, however, in her position that these Bankruptcy Code sections are insufficient to defeat the sovereign immunity she has from injunctive relief under nonbankruptcy law, namely § 634(b)(1) of the Small Business Act (doc. # 11, pp. 10–14). That statute provides, in relevant part:

> (b) Powers of Administrator. In the performance of, and with respect to, the functions, powers, and duties vested in him by this Act the Administrator may—
>
> > (1) sue and be sued in any court of record of a State having general jurisdiction, or in any United States district court, and jurisdiction is conferred upon such district court to determine such controversies without regard to the amount in controversy; but no … injunction … or other similar process, mesne or final, shall be issued against the Administrator or his property[.]

3

15 U.S.C. § 634(b)(1).

In two recent companion decisions, the Bankruptcy Court for the District of Maine harmonized these potentially conflicting statutes and determined it was authorized to enter a carefully tailored TRO against the SBA based on the Defendant's discriminatory conduct, notwithstanding § 634(b), in reliance on Bankruptcy Code §§ 105, 106, and 525. See Penobscot Valley Hospital v. Carranza (In re Penobscot Valley Hospital), Adv. No. 20-ap-01005 (Bankr. D. Me. May 1, 2020); Calais Regional Hospital v. Carranza (In re Calais Regional Hospital), Adv. No. 20-ap-01006 (Bankr. D. Me. May 1, 2020) (Fagone, J.) (citing Ulstein Maritime, Ltd. v. United States, 833 F.2d 1052 (1st Cir. 1987). Although Ulstein is not binding in this Circuit, in the absence of binding authority from the Second Circuit, the Court finds Ulstein's rationale – as well as the reasoning of its sister court in Penobscot and Calais – to be persuasive.

In Ulstein, the First Circuit opined:

> The bare language facially [of § 634(b)(1)] suggests that "no . . . injunction" can be directed at the SBA. Some courts have read the wording in this way, and concluded that all injunctive relief directed at the SBA is absolutely prohibited. E.g., Valley Constr. Co. v. Marsh, 714 F.2d at 29; Little v. United States, 489 F. Supp. 1012, 1016 (C.D. Ill. 1980), aff'd, 645 F.2d 77 (7th Cir. 1981); Mar v. Kleppe, 520 F.2d at 869; Romeo v. United States, 462 F.2d 1036, 1038 (5th Cir.), cert. denied, 410 U.S. 928, 35 L. Ed. 2d 589, 93 S. Ct. 1361 (1973), Expedient Servs., Inc. v. Weaver, 614 F.2d 56 (5th Cir. 1980); Jets Servs., Inc. v. Hoffman, 420 F. Supp. 1300, 1308–09 (M.D. Fla. 1976). However, other courts have found that § 634(b)(1) does not bar injunctions in all circumstances. Cavalier Clothes v. United States, 810 F.2d 1108, 1112 (Fed. Cir. 1987); Oklahoma Aerotronics v. United States, 213 U.S. App. D.C. 64, 661 F.2d 976, 977 (D.C. Cir. 1981); Related Indus. v. United States, 2 Cl. Ct. 517, 522 (1983). See also Dubrow v. Small Business Admin., 345 F. Supp. 4, 7 (D.Cal. 1972); Simpkins v. Davidson, 302 F. Supp. 456, 458 (S.D.N.Y. 1969).
>
> The meaning of the limitation on the waiver of immunity in § 634(b)(1) was analyzed in Cavalier Clothes, 810 F.2d at 1108. There the court reviewed and endorsed the careful analysis of the legislative history of § 634(b)(1) in Related Industries, 2 Cl.Ct. at 522–23. The origin and purpose of the language in § 634(b)(1) goes back to the decision in FHA v. Burr, 309 U.S. 242, 84 L. Ed. 724, 60 S. Ct. 488 (1940), which held that when Congress established an agency that was authorized to engage in business transactions and permitted it to "sue and be sued" (as is true of the SBA), this waiver extended to all civil processes incident to suit such as garnishment and attachment of the agency's assets. Therefore, language such as that in § 634(b)(1) was added to enabling statutes to bar the attachment of agency funds and other interference with agency functioning. The same boilerplate language is found repeatedly in statutes establishing agencies that provide loans or funds to the public, e.g., 7 U.S.C. § 1506(d) (Federal Crop Insurance Corporation); 15 U.S.C. § 714b(c) (Commodity Credit Corporation); 42 U.S.C. § 3211(11) (Secretary of Commerce). See Related Industries, 2 Cl. Ct. at 522 n.2. While the specific legislative history of § 634(b)(1) is silent on the purpose of this language, the legislative history of earlier statutes containing the identical wording indicates that it was intended to keep creditors or others suing the government from hindering and obstructing agency operations through mechanisms such as attachment of funds. "Nothing in the language or the legislative history of § 634 suggests that Congress

4

> intended to grant the SBA any greater immunity from injunctive relief than that possessed by other governmental agencies." Cavalier Clothes, 810 F.2d at 1112. "Rather, it merely intended to insure that the SBA be treated the same as any other government agency in this respect." Related Industries, 2 Cl. Ct. at 522. **The no-injunction language protects the agency from interference with its internal workings by judicial orders attaching agency funds, etc., but does not provide blanket immunity from every type of injunction. In particular, it should not be interpreted as a bar to judicial review of agency actions that exceed agency authority where the remedies would not interfere with internal agency operations**.

Ulstein, 833 F.2d at 1056–57 (emphasis added).

Congress enacted § 106 of the Bankruptcy Code in 1978, 20 years after it enacted § 634 of the Small Business Act in 1958 (and 25 years after prior similar provisions of that Act were originally enacted in 1953). The language of § 106(a) unequivocally expresses Congress' intent to abrogate sovereign immunity with respect to Bankruptcy Code §§ 105, 106, and 525. Congress has not authorized the Defendant to take actions that violate Bankruptcy Code § 525(a), and the TRO the Plaintiff seeks here would not interfere with the SBA's internal agency operations (see § B.3, infra). See also Penobscot, Bankr. D. Me. Adv. No. 20-ap-01005, at pp. 3–4.

Accordingly, THE COURT FINDS it is authorized under Bankruptcy Code §§ 105, 106, and 525 to enter carefully tailored injunctive relief against the Defendant, it has constitutional authority to enter a final judgment on the § 525 cause of action, and it is not barred from doing so by 15 U.S.C. § 634(b)(1).

### B. Application of TRO Factors to the Plaintiff's § 525(a) Claim

Having disposed of the threshold question, the Court turns to the salient question of whether a TRO is warranted based on the Plaintiff's § 525(a) claim. The Plaintiff argues each of the four TRO factors weighs in its favor; conversely, the Defendant argues the Plaintiff has failed to meet its burden of proof on these factors and, in any event, each factor weighs against the granting of injunctive relief. The Court will examine each of the four prongs of the TRO test with respect to the Plaintiff's §525(a) claim.

*1. Likelihood of Success on the Merits*

The Plaintiff argues the Defendant is violating § 525(a) of the Bankruptcy Code by denying the Plaintiff an opportunity to have its PPP application considered on the sole basis that the Plaintiff is a debtor in a bankruptcy case (doc. # 2, p. 10; doc. # 15, p. 2).  The Defendant counters that Bankruptcy Code § 525(a) does not apply to the PPP because the funds entities receive through the PPP are loans, and thus outside the ambit of § 525 (doc. # 11, p. 14).

As noted in § A, infra, Bankruptcy Code § 525(a) provides, in relevant part, that "a governmental unit may not deny … a license, permit, charter, franchise, or other similar grant to" a bankruptcy debtor.

5

Thus, the Court must determine whether the Defendant's exclusion of the Plaintiff from the universe of eligible PPP applicants constitutes the denial of, or discrimination with respect to, a "license, permit, charter, franchise, or other similar grant" for purposes of § 525(a).

The Defendant points to cases holding that § 525(a) does not extend to loans or that a loan is not "a license, permit, charter, franchise, or other similar grant" within the meaning of § 525(a) (doc. # 11, p. 15) (citing Watts v. Penn. Housing Fin. Co, 876 F.2d 1090, 1094 (3d Cir. 1989), Ayes v. U.S. Dep't of Veterans Affairs, 473 F.3d 104, 110 (4th Cir. 2006), Toth v. Mich. State Housing Development Authority, 136 F.3d 477, 480 (6th Cir. 1998). The Defendant also cites In re Goldrich, 771 F.2d 28, 30 (2d Cir. 1985), in which the Second Circuit declined to extend § 525 to student loan guarantees, in support of her argument that § 525 does not apply to loans. However, the Court finds this characterization of the Second Circuit's position to be unpersuasive, especially in light of the Second Circuit's interpretation of § 525(a) in a more recent case, Stoltz v. Brattleboro Housing Auth. (In re Stoltz), 315 F.3d 80, 93 (2d Cir. 2002).

The question before the Second Circuit in Stoltz was "whether a public housing lease is a grant 'similar' to a 'license, permit, charter, [or] franchise,'" id. at 90, and "discerned from the plain text of section 525(a) that a public housing lease, and therefore the debtor-tenant's current right to participate in the public housing program, is a protected grant[.]" Id. at 92. The Second Circuit reasoned:

> Although courts and commentators generally refer to section 525(a) as the antidiscrimination provision, section 525 contains two additional antidiscrimination provisions, which were added after the 1978 enactment of section 525(a). Section 525(b), enacted in 1984, prohibits discrimination against debtors by private employers. 11 U.S.C. § 525(b) (1999). Section 525(c), enacted in 1994, prohibits discrimination against debtor-borrowers on the basis of discharged, unrepaid loans by governmental units operating a student loan or grant program. 11 U.S.C. § 525(c) (2001). Section 525(c) signaled congressional disapproval of Goldrich v. New York State Higher Educ. Servs. Corp., 771 F.2d 28 (2d Cir. 1985), in which this Court had narrowly construed section 525(a)'s "other similar grant" language to not include extensions of credit. Neither section 525(b) nor section 525(c) is implicated by this appeal.

Id. at p. 86, n. 2.

Given the Second Circuit's broad construal of § 525(a)'s "other similar grant" language in Stoltz to include a public housing lease, the Court does not find the narrow interpretation of that provision in Goldrich, a case decided 17 years before Stoltz and disapproved by Congress, to require the Court to so narrowly construe § 525 here.[4]

---

[4] At the May 6th hearing, the Defendant raised a new argument regarding Stoltz that it had not previously raised in the Springfield Hospital proceeding, namely that Stoltz is distinguishable here because a public housing lease is a property interest and essential governmental service. This argument does not change this Court's view at the TRO stage that Stoltz construes § 525(a) broadly, or the Court's calculus that the Plaintiff has met its burden on this prong of the TRO test. The parties will have additional opportunity for briefing the merits of the Plaintiff's right to relief prior to trial of the § 525(a) claim.

6

The CARES Act is not a statute enacted to increase the availability of commercial loans. Rather, the CARES Act is a grant of financial aid necessitated by a public health crisis. See Penobscot, Bankr. D. Me. Adv. No. 20-ap-01005, at p. 7. Congress enacted and the President signed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") on or about March 27, 2020, and § 1102 of the CARES Act established the PPP as a convertible loan program under § 7(a) of the Small Business Act (15 U.S.C. § 633(a)). There are very few PPP eligibility requirements under the CARES Act, and no underwriting mandates. It merely requires that an applicant (1) is a small business concern or any business concern, nonprofit organization, veterans organization, or Tribal business concern described in § 31(b)(2)(C) of the Small Business Act; (2) does not employ more than the greater of 500 employees or, if applicable, the size standard in number of employees established by the Administration for the industry in which the business concern, nonprofit organization, veterans organization, or Tribal business concern operates; (3) was in operation on February 15, 2020; and (4) either had employees for whom the borrower paid salaries and payroll taxes, or paid independent contractors as reported on a Form 1099-MISC. While a PPP disbursement is nominally designated as a "loan," § 1106 of the CARES Act provides for loan forgiveness – essentially treating the PPP disbursement as a grant with no repayment obligation – as long as the funds are used as the Act requires. In essence, if the borrower complies with the so-called loan program it actually gets a grant, rather than a loan; a repayment obligation only arises if the borrower fails to use the funds for purposes underlying the CARES Act.

The Plaintiff certifies, via the sworn declaration of its acting CEO, it only seeks PPP funds in an amount that could be forgiven, and if any funds would exceed the amount to be forgiven, it intends to immediately repay that amount (doc. # 1, p. 5, ¶ 20, p. 13; doc. # 15, p. 5). Further, this Court has broad authority to oversee the Plaintiff's use of funds and can ensure the Plaintiff complies with loan forgiveness criteria. See Springfield Hospital, 20-ap-01003, doc. # 20, p. 7.

The Plaintiff's arguments and certification of intentions, as well as the import and purpose of the CARES Act, persuade the Court that if the Plaintiff were granted funds through the PPP that so-called loan would be eligible for forgiveness and therefore would, for all intents and purposes, be a grant. Accordingly, THE COURT FINDS the Plaintiff has made a sufficient showing that the PPP could be characterized as an "other similar grant" that the Plaintiff has demonstrated a likelihood of success on the merits of its § 525(a) claim.

2. *Likelihood of Irreparable Harm Absent Relief*

In its Complaint and TRO Motion, the Plaintiff asserts that, in the absence of another source of liquidity, it would run out of money in the near term (doc. # 1, ¶ 27, p. 13; doc. # 2, p. 7). The Defendant contends the Plaintiff's projection that it may run out of money in the near term, without supporting evidence, is insufficient to satisfy the irreparable harm prong of the TRO test (doc. # 11, p. 27).

7

In its supplemental memorandum, the Plaintiff further asserts (i) it is unknown when the Plaintiff will be able to reopen its facilities or revenue will return to pre-COVID-19 levels, (ii) the Plaintiff will need the PPP and other emergency funds to maintain operations and continue providing health care services if revenue does not return in the upcoming weeks, and (iii) absent a TRO, it will then be too late for the Plaintiff, as the PPP money will no longer be available when the Plaintiff needs it most (doc. # 15, p. 7). The Plaintiff reports that the first tranche of PPP funds has already been depleted, and the SBA continues to process new applications and disburse new funds daily (id. at p. 6).

At the May 6th hearing, the Plaintiff reported it had received a $1.3 million grant that morning, which the Plaintiff expects will enable it to cover operating expenses – and prevent closure – through July or August. The Plaintiff further stated it is not aware of any other similarly sized source of funding available to it; moreover, other sources of funding would not mitigate the irreparable harm caused to the Plaintiff if the PPP funds run out of money, leaving the Plaintiff with no remedy. The Plaintiff averred that 60% of the second tranche of PPP funds was disbursed within one week of being made available, and urged that the Court could reasonably infer the remaining funds would be depleted within a week or two.

The Defendant argued at the hearing that (i) there is a significant distinction between the financial positions of the Plaintiff and the debtor in the Springfield Hospital case as the Plaintiff has recently received several grants, (ii) the record is insufficient to establish the PPP funds will soon be fully expended, as press reports regarding this issue are merely speculative, and (iii) the Plaintiff has failed to meet its burden of demonstrating imminent and non-theoretical irreparable harm. In response to the Court's question whether the Defendant could provide more definitive information on the status of the PPP funds, as she was in the best position to know when those funds were projected to run out, the Defendant did not provide any additional information, instead offering to brief the issue and reiterating her position that the TRO should be denied.

Attorney Elizabeth Glynn, who represents creditor Berkshire Bank in the Plaintiff's bankruptcy case, reported at the hearing that Berkshire Bank had stopped taking any applications for PPP loans because of the volume of applications received, and based on that it appeared the funds were running out.

While the record is not developed at this very early stage of the adversary proceeding, the Complaint is supported by the sworn declaration of the Plaintiff's acting CEO, affirming the Plaintiff's projection that it will run out of money in the near term, which would force the Plaintiff to immediately close without funds for an orderly wind-down, causing irreparable harm (doc. # 1, p. 6, ¶ 27, p. 12). The sworn declaration also affirms the PPP funds are available to approved applicants on a first come, first served basis and, so long as the Plaintiff's application remains denied and ineligible, other applicants will receive PPP funds and further deplete the finite amount of available funds until they run out (id. at pp. 5–6, ¶ 23, p. 12).

8

There is also ample evidence in the Plaintiff's chapter 11 bankruptcy case to establish a solid and sufficient factual basis for the Plaintiff's assertions regarding its precarious financial position as a result of the COVID-19 pandemic, particularly the record since late March.

The Court held its most recent telephonic case management conference in the case on March 24, 2020, at which Attorneys Anderson, Prescott, and Ranaldo were present (case # 19-10285, doc. # 343, p. 1). At that conference, Attorney Anderson explained that, in response to the pandemic, the Plaintiff needed to significantly modify its operations, implement new treatment staffing protocols, divert resources from elective procedures to treatment of COVID-19 cases, purchase expensive but critical supplies, and close or radically change department functions (id. at p.2). He articulated the dramatic impact the pandemic has had on the Plaintiff's bottom line: it had less income and higher expenses than it could have projected, expected the trend to continue, and needed an infusion of cash to meet urgent and changing needs (id.).

The Plaintiff filed a status update on April 17, 2020, reporting that it continued to operate on a modified basis in response to the pandemic; weekly revenue had been better than its COVID-19 projections, but the Plaintiff continued to experience decreased revenue compared to its pre-pandemic projections (case # 19-10285, doc. # 357, p. 1). The Plaintiff reported it had received state and federal financial help, expected to remain cash positive for roughly six weeks, and was currently developing models reflecting operational changes in the event the COVID-19 impact lasted longer than projected (id. at p. 2).

On April 20, 2020, just a few days after that case management conference, the Plaintiff filed an emergency motion seeking approval of post-petition financing from the State of Vermont in the form of a prospective Medicaid payment, in order to stabilize the Plaintiff's operations due to anticipated cash shortfalls resulting from COVID-19 (case # 19-10285, doc. # 361, p. 1). The Court approved the Plaintiff's emergency motion on April 23, 2020 (case # 19-10285, doc. # 365).

Based on this record in the Plaintiff's bankruptcy case and this adversary proceeding, including the Complaint and TRO Motion, and the representations made at the May 6th hearing, the Plaintiff has shown it faces ongoing cash shortfalls due to the COVID-19 pandemic, PPP or other funds are needed to avoid irreparable harm to the Plaintiff, and the PPP funds are likely to be depleted before a final order would enter in this proceeding, thus depriving the Plaintiff of a remedy absent a TRO. The Defendant has presented no evidence to the contrary.

Based on this record, THE COURT FINDS there is a significant likelihood the Plaintiff will suffer irreparable harm without this relief and the Plaintiff has met its burden on this prong of the TRO test.

### 3. *Balance of Equities*

The Plaintiff argues the balance of equities tips in favor of granting the TRO, as there is no harm

to the Defendant in requiring her to implement the PPP without discriminating against the Plaintiff and to process the Plaintiff's application if, but for that discrimination, the Plaintiff would qualify for PPP funds (doc. # 2, p. 14). The Defendant contends that granting the injunctive relief the Plaintiff could disrupt the administration of the PPP in the middle of loan distribution (doc. # 11, p. 2), but has not proffered any rationale for this contention or otherwise addressed this TRO factor in her papers.

The Plaintiff seeks a TRO to (i) enjoin the Defendant from discriminating against the Plaintiff's PPP application, (ii) require the Defendant to authorize a lender to process the Plaintiff's PPP application without regard to the Plaintiff's status as a bankruptcy debtor, and (iii) require the Defendant to reserve sufficient funds and guaranty authority to provide the Plaintiff with access to approximately $1.8 million in PPP funds if the Plaintiff is determined to be eligible for PPP funds (see doc. # 2-7, § 4(C); doc. # 1, p. 11). It is not apparent to the Court – and the Defendant has not explained – how this TRO would significantly disrupt administrative of the PPP, or how any purported disruption outweighs the clear harm to the Plaintiff if the TRO Motion is denied.

For these reasons, THE COURT FINDS the Plaintiff's argument on this prong to be persuasive and balancing the equities weighs in favor of granting the TRO Motion.

### 4. *Public Interest*

The Plaintiff asserts injunctive relief serves the public interest because Congressional policy favors reorganization, the Plaintiff is one of the largest private sector employers in its geographic area, and in this time of the COVID-19 pandemic the public is best served by ensuring the Plaintiff continue providing health care services to the area. Moreover, as one of the largest private sector employers in the region it serves, the Plaintiff alleges its continued vitality is essential for the economic development and employment of residents in the area (doc. # 2, p. 15). The Defendant counters that the public interest weighs against the Plaintiff here because the proposed injunction would short-circuit the rapidly evolving political and administrative landscape of responding to COVID-19 and posits the granting of a TRO could have far-reaching consequences. This latter focus, however, rests on its characterization of the relief the Plaintiff seeks as "broad injunctive relief" and a "nationwide injunction" (doc. # 11, p. 29, 30).[5] The record does not support that interpretation of the Debtor's TRO Motion.

The Plaintiff's supplemental memorandum makes it absolutely clear it is seeking a TRO solely with respect to its own PPP application, not as a nationwide injunction on behalf of all debtors in bankruptcy (doc. # 15, p. 10) ("[The Plaintiff] does not seek a remedy that applies to any other debtor besides itself."). With this clarification, the Court finds the Plaintiff's position to be compelling. The

---

[5] The Defendant also argues public interest weighs against injunctive relief because it would reverse the SBA's policy to exclude bankruptcy debtors from PPP, and Congress made the SBA immune from injunction (doc. # 11, p. 28). Since the Court rejected this sovereign immunity argument in its analysis of the likelihood of the merits, supra, it does not address it again here.

Plaintiff's business, both as a "front line" health care provider and as one of the largest private sector employers in the area, is vital to the public, especially in the midst of the COVID-19 pandemic. The TRO, limited to the Plaintiff's PPP application, is sufficiently narrow in scope to allay the public interest concerns articulated by the Defendant.

Thus, THE COURT FINDS the public interest prong, like the prior three prongs, also weighs in favor of granting the TRO Motion.

### C. The Plaintiff's Remaining Bases for Relief

The Plaintiff also (a) seeks declaratory relief on the basis that the Defendant impermissibly exceeded her statutory authority under the CARES Act and the Small Business Act, and (b) seeks mandamus relief under 28 U.S.C. § 1361 (doc. ## 1, 2). Since the Court has determined the Plaintiff has met its burden for a TRO based solely on its § 525(a) claim, there is no need for the Court to address the Plaintiff's other claims or the Defendant's arguments in opposition to them.

### CONCLUSION

Based on the record in the Plaintiff's chapter 11 bankruptcy case and in this adversary proceeding, including the representations of the parties at the May 6th hearing, THE COURT FINDS the Plaintiff has met its burden on the § 525 claim for a temporary restraining order on the narrow terms set forth in this decision, and more fully described in the accompanying order.[6]

This memorandum of decision constitutes the Court's findings of fact and conclusions of law.

May 8, 2020 at 12:50 P.M.  
Rutland, Vermont

Colleen A. Brown  
United States Bankruptcy Judge

---

[6] The Court makes no findings as to whether the Plaintiff qualifies for a PPP loan or whether the Plaintiff's PPP application should be granted.

11