*Formatted for Electronic Distribution*                                         *For Publication*

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF VERMONT

Filed & Entered
On Docket
06/22/2020

---

**In re:**

**Springfield Hospital, Inc.,**
    **Debtor-in-Possession.**

**Chapter 11 Case**
**# 19-10283**

---

**In re:**

**Springfield Hospital, Inc.,**
    **Plaintiff,**
        **v.**
**Jovita Carranza, in her capacity as**
**Administrator for the U.S. Small**
**Business Administration,**
    **Defendant.**

**Adversary Proceeding**
**# 20-01003**

---

**In re:**

**Springfield Medical Care Systems, Inc.,**
    **Debtor-in-Possession.**

**Chapter 11 Case**
**# 19-10285**

---

**In re:**

**Springfield Medical Care Systems, Inc.,**
    **Plaintiff,**
        **v.**
**Jovita Carranza, in her capacity as**
**Administrator for the U.S. Small**
**Business Administration,**
    **Defendant.**

**Adversary Proceeding**
**# 20-01004**

---

*Appearances:*  *Andrew Helman, Esq.*
    *Murray, Plumb & Murray*
    *Portland, ME*
    *For Springfield Hospital*

*Michael Tye, Esq.*
*U.S. Department of Justice*
*Washington, DC*
*For the Defendant*

    *D. Sam Anderson & Adam R. Prescott, Esq.*
    *Bernstein, Shur, Sawyer & Nelson, P.A.*
    *Portland, ME*
    *For Springfield Medical Care Systems*

*Melissa A. D. Ranaldo, Esq.*
*U.S. Attorney's Office – Vermont*
*Burlington, Vermont*
*For the Defendant*

    *James F. Raymond, Esq.*
    *Upton & Hatfield, LLP*
    *Concord, NH*
    *For Mascoma Bank*

**MEMORANDUM OF DECISION**

**GRANTING SUMMARY JUDGMENT AND PERMANENT INJUNCTION TO PLAINTIFFS ON THE § 525 CLAIMS**

The Plaintiffs, Springfield Hospital, Inc. ("SH"), and Springfield Medical Care Systems, Inc. ("SMCS") (collectively, the "Plaintiffs"), have each commenced an adversary proceeding against the Defendant, Jovita Carranza, in her capacity as Administrator for the U.S. Small Business Administration (the "Defendant"). Based on the record in these adversary proceedings and bankruptcy cases, and the arguments presented at the June 10, 2020 hearing, and for the reasons set forth below, the Court grants summary judgment, and a permanent injunction, to the Plaintiffs on their 11 U.S.C. § 525(a) claims.

## JURISDICTION

This Court has jurisdiction over these adversary proceedings pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Order of Reference entered on June 22, 2012. This decision addresses a cause of action under § 525 of the Bankruptcy Code and thus is a core proceeding arising under Title 11 of the United States Code as described in 28 U.S.C. § 157(b)(2)(A), (D), and (O). The Court further finds it has constitutional authority to enter a final judgment in this consolidated proceeding.

## PROCEDURAL HISTORY

On April 27, 2020, SH filed a verified complaint to commence this adversary proceeding (AP # 20-1003, doc. # 1, amended at doc. # 3) and a motion for an emergency hearing on its request for a temporary restraining order ("TRO") (AP # 20-1003, doc. # 2). Two days later, SMCS filed a similar verified complaint (AP # 20-1004, doc. # 1) and motion (AP # 20-1004, doc. # 2).[1]

Pursuant to the Court's scheduling orders (AP # 20-1003, doc. # 5; AP # 20-1004, doc. # 6), the Defendant filed a response in each proceeding (AP # 20-1003, doc. # 10; AP # 20-1004, doc. # 11). The Plaintiffs each filed a supplemental memorandum of law (AP # 20-1003, doc. # 11; AP # 20-1004, doc. # 15).[2] The Court held an emergency hearing in each proceeding and granted the requested TROs (AP # 20-1003, doc. ## 19, 20; AP # 20-1004, doc. ## 18, 22).

The Court held a status hearing on SH's request for a preliminary injunction on May 7, 2020, at which it extended the TRO in the SH proceeding, and subsequently issued an order in both adversary proceedings, inter alia, advancing the trial on the merits and consolidating it with the preliminary injunction hearings, and declaring it would conduct a joint trial, to the extent a trial of fact was necessary,

---

[1] The Defendant's answer was originally due on May 28, 2020, in the SH proceeding (AP # 20-1003, doc. # 4) and on May 30, 2020, in the SMCS proceeding (AP # 20-1004, doc. # 5). However, the Court extended the deadline for the Defendant to file an answer in both proceedings to a date after June 23, 2020 (AP # 20-1003, doc. # 60; AP # 20-1004, doc. # 58). Based on the instant decision in favor of the Plaintiffs, no answer is required.

[2] Although permitted to by the scheduling orders (see AP # 20-1003, doc. # 5; AP # 20-1004, doc. # 6), the Defendant did not file a supplemental memorandum of law at that time.

on the Plaintiffs' claims under 11 U.S.C. § 525(a),[3] extending the TRO in the SMCS proceeding, and setting a schedule for trial (AP # 20-1003, doc. # 24; AP # 20-1004, doc. # 21).

On May 11, 2020, the Court entered a written order modifying and extending the TRO in the SH proceeding through June 2, 2020 (AP # 20-1003, doc. # 27); the next day, the Court entered a similar written order modifying and extending the TRO in the SMCS proceeding through June 4, 2020 (each, the "Second TRO"), and canceling the status hearing set for May 12, 2020, on SMCS's request for a preliminary injunction (AP # 20-1004, doc. # 27), since SMCS and the Defendant addressed all open issues in the joint status report they filed on May 11, 2020 (AP # 20-1004, doc. # 26).

On May 14, 2020, pursuant to the Court's schedule for trial, the parties filed the following factual declarations and exhibits: (1) SH filed a declaration of Michael Halstead, interim chief executive officer ("CEO") of SH, with 11 exhibits (AP # 20-1003, doc. # 36); (2) SMCS filed a declaration of Joshua Dufresne, acting CEO of SMCS, with 10 exhibits (AP # 20-1004, doc. # 32); (3) the Plaintiffs filed a declaration of Dawn Morse, a paralegal employed by counsel for SH, with two exhibits (AP # 20-1003, doc. # 34; AP # 20-1004, doc. # 34); and (4) the Defendant filed a declaration of John A. Miller, Deputy Associate Administrator for Capital Access for the U.S. Small Business Administration ("SBA"), with two exhibits (AP # 20-1003, doc. # 30; AP # 20-1004, doc. # 28), along with a declaration of Michael S. Tye, counsel for the Defendant, with 12 exhibits (AP # 20-1003, doc. # 32; AP # 20-1004, doc. # 30).

On May 18, 2020, the parties filed the following statements regarding material facts in dispute: (1) SH filed responses to the declarations of John A. Miller, with three exhibits (AP # 20-1003, doc. # 39), and Michael S. Tye (AP # 20-1003, doc. # 40); (2) SMCS filed responses to the declarations of John A. Miller, with two exhibits (AP # 20-1004, doc. # 37), and Michael S. Tye (AP # 20-1004, doc. # 38); and; (3) the Defendant filed a statement identifying eight material facts in dispute, in the consolidated proceedings (AP # 20-1003, doc. # 41; AP # 20-1004, doc. # 39).

The Court held a joint status conference on May 19, 2020, at which counsel for the Plaintiffs and counsel for the Defendant each took the position there were no material facts in dispute with respect to either the § 525(a) count in the complaints, or the Plaintiffs' request for a remedy in the form of a permanent injunction. The Court entered an order on the same date determining there were no material facts in dispute, canceling the trial of fact, setting a briefing schedule, and extending the TROs in both adversary proceedings through the earlier of June 15, 2020, or the date the Court issued its decision on the § 525 claims (AP # 20-1003, doc. # 43; AP # 20-1004, doc. # 41). The next day, the Court entered a supplemental order indicating summary judgment was the appropriate procedural approach for resolution of the Plaintiffs' § 525 claims, instructing the parties to take this procedural posture into account in their

---

[3] All statutory citations hereafter refer to Title 11 of the United States Code (the "Bankruptcy Code") unless otherwise indicated.

memoranda of law, and scheduling oral arguments to occur on June 10, 2020, if the Court decided oral arguments were needed, after reviewing the memoranda of law it was directing the parties to file (AP # 20-1003, doc. # 44; AP # 20-1004, doc. # 42).

The parties then filed the following supplemental memoranda of law, pursuant to the Court's briefing schedule: (1) on May 29, 2020, SH filed a memorandum of law in support of its § 525 claim, with six exhibits (AP # 20-1003, doc. # 48); (2) on the same date, SMCS filed a memorandum of law in support of its § 525 claim, with six exhibits (AP # 20-1004, doc. # 45); (3) on June 8, 2020, Mascoma Bank ("Mascoma") filed a memorandum of law in support of its request for certain rulings in any judgment the Court entered in favor of the Plaintiffs (AP # 20-1003, doc. # 54; AP # 20-1004, doc. # 52); and (4) on the same date, the Defendant filed a memorandum of law in opposition to the Plaintiffs' § 525 claims (AP # 20-1003, doc. # 56; AP # 20-1004, doc. # 54). Neither the Plaintiffs nor the Defendant sought leave to file a response to Mascoma's memorandum of law.

On the morning of June 9, 2020, the Court entered an order (i) confirming oral arguments would proceed, (ii) indicating topics to be addressed at that hearing, and (iii) directing the Defendant to file a supplement identifying certain cases she had referenced without names or citations in her memorandum (AP # 20-1003, doc. # 57; AP # 20-1004, doc. # 55). The Defendant timely filed a supplement identifying those five cases (AP # 20-1003, doc. # 58; AP # 20-1004, doc. # 56). The Court held oral arguments on June 10, 2020, which lasted approximately two and a half hours, and then took the matter under advisement.

On June 11, 2020, the Court issued an order further extending the TROs through June 22, 2020, to provide the Court with additional time to formulate and write the instant memorandum of decision, based on the significant developments in, and germane to, these proceedings over the prior week (AP # 20-1003, doc. # 60; AP # 20-1004, doc. # 58).

## ISSUES PRESENTED

The issues presented are whether summary judgment is proper and, if so, then (A) whether the Defendant is in violation of § 525(a), and (B) if so, whether a permanent injunction is warranted, as a matter of law.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Jackson v. Fed. Express, 766 F.3d 189, 193–94 (2d Cir. 2014). "A genuine issue exists – and summary judgment is therefore improper – where the evidence is such that a reasonable jury could decide in the non-movant's favor." Brandon v. Kinter, 938 F.3d 21, 31 (2d Cir. 2019) (citation and quotation marks omitted). "[T]he substantive law will identify which facts are material. Only disputes over facts that

4

might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1985) (citation omitted). "The court construes all evidence in the light most favorable to the non-moving party, drawing all inferences and resolving all ambiguities in his favor." Amore v. Novarro, 624 F.3d 522, 529 (2d Cir. 2010) (citing LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 205 (2d Cir. 2005)); see also Burns v. Martuscello, 890 F.3d 77, 83 (2d Cir. 2018). However, "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment[.]" Flores v. United States, 885 F.3d 119 (2d Cir. 2018) (quoting Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996)).

## UNDISPUTED MATERIAL FACTS

As noted above, on May 20, 2020, the Court issued its order putting the parties on notice that it would determine the Plaintiffs' § 525(a) claims via a summary judgment procedure (AP # 20-1003, doc. # 44, p. 2; AP # 20-1004, doc. # 42, p. 2). At that time, the Court indicated it would treat the various declarations the parties had filed as their statements of facts, and identified the documents it would treat as the parties' statements of disputed facts (id.).

The Plaintiffs, along with party in interest Mascoma, subsequently filed briefs that included supplemental statements of fact, as well as redacted versions of their previously filed declarations in response to the Defendant's previous objection (AP # 20-1003, doc. ## 48, 48-1, 54; AP # 20-1004, doc. ## 45, 45-1, 52). Additionally, at the June 10, 2020 hearing, the Defendant withdrew, for purposes of summary judgment, the declaration of John A. Miller (AP # 20-1003, doc. # 30; AP # 20-1004, doc. # 28), as it pertained to the Plaintiffs' APA claims that are not currently before the Court (see AP # 20-1003, doc. # 44, p. 3; AP # 20-1004, doc. # 42, p. 3).

The Court finds the following statements set forth undisputed facts material to this summary judgment motion (each statement, a "UMF"):[4]

1. SH is a Vermont non-profit business corporation that operates a 25-bed general medical and surgical hospital located in Springfield, Vermont, with approximately 451 employees filling more than 250 full-time equivalent positions (AP # 20-1003, doc. # 36, ¶¶ 4–5, doc. # 36-1, p. 4, ¶ 8, doc. # 41, doc. # 48-1, ¶¶ 4–5).

2. SMCS is a Vermont non-profit business corporation that provides medical services to communities in southeastern Vermont and southwestern New Hampshire through its operation of thirteen federally qualified health centers ("FQHC") and two non-FQHC daycare sites. SMCS has approximately 220 employees and is one of the largest employers in the Springfield, Vermont area (AP # 20-1004, doc. # 32, ¶ 4, doc. # 39, doc. # 45-1, ¶ 4).

3. The SBA is an agency and unit of the United States government (AP # 20-1004, doc. # 32, ¶ 22, doc. # 39, doc. # 45-1, ¶ 22).

---

[4] Pursuant to Vt. LBR 7056-1(a)(3), a respondent is deemed to have admitted all facts in the movant's statement of undisputed material facts which they do not controvert in their statement of disputed material facts.

4. On June 26, 2019, SH and SMCS each filed a voluntary petition under chapter 11 of the Bankruptcy Code. No trustee has been appointed in either case and SH and SMCS continue to operate their businesses as debtors-in-possession (AP # 20-1003, doc. # 36, ¶¶ 5–7, doc. # 41, doc. # 48-1, ¶¶ 5–7; AP # 20-1004, doc. # 32, ¶¶ 6–8, doc. # 39, doc. # 45-1, ¶¶ 6–8).

5. On or about March 27, 2020, Congress enacted, and the President signed, the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"). The CARES Act includes stimulus funds designed to assist businesses and ensure that American workers continue to be paid despite the economic impact of Covid-19 and social distancing measures. Section 1102 of the CARES Act establishes the Paycheck Protection Program ("PPP") as a convertible loan program under § 7(a) of the Small Business Act, codified in 15 U.S.C. § 636. There are no repayment obligations for PPP disbursements if, among other things, PPP funds are used for payroll and wage expenses. Section 1102 of the CARES Act does not prohibit extending funds under PPP to a chapter 11 debtor (AP # 20-1003, doc. # 36, ¶¶ 17–19, 26doc. # 41, ¶ 1, doc. # 48-1, ¶¶ 17–19, 26; AP # 20-1004, doc. # 32, ¶¶ 16–18, 25, doc. # 39, ¶ 1, doc. # 45-1, ¶¶ 16–18, 25).

6. A party can obtain funds under the PPP by applying with any federally insured participating lender using an application form created by the SBA. If the application is approved by the SBA, the SBA guarantees 100% of the funds advanced to the applicant, and pays the lender all amounts forgiven under the CARES Act and PPP (AP # 20-1003, doc. # 36, ¶ 23, doc. # 41, ¶ 3, doc. # 48-1, ¶ 23; AP # 20-1004, doc. # 32, ¶ 21, doc. # 39, ¶ 3, doc. # 45-1, ¶ 21).[5]

7. On or about April 2, 2020, the SBA released its form of application for the PPP. The first question on the PPP application form asks whether "the Applicant ... [is] presently involved in any bankruptcy[.]" The second question on the official PPP application form is whether "the Applicant, any owner of the Applicant, or any business owned or controlled by any of them, ever obtained a direct or guaranteed loan from SBA or any other Federal agency that is currently delinquent or has defaulted in the last 7 years and caused a loss to the government[.]" The official form of application also states: "If questions (1) or (2) below are answered 'Yes,' the loan will not be approved" (AP # 20-1003, doc. # 36, ¶¶ 24, 26–28, doc. # 41, doc. # 48-1, ¶¶ 24, 26–28; AP # 20-1004, doc. # 32, ¶¶ 23, 25–27; doc. # 39, doc. # 45-1, ¶¶ 23, 25–27).

8. On or about April 8, 2020, SH submitted an application for PPP funds to its commercial lender, Berkshire Bank. SH answered "yes" to question 1 because it is a debtor. SH answered "yes" to question 2 based on the understanding at that time that its federally guaranteed loans with Berkshire Bank were "delinquent" within the meaning of applicable SBA regulations (AP # 20-1003, doc. # 36, ¶¶ 29–31, doc. # 41, doc. # 48-1, ¶¶ 29–31).

9. SBA's SOP 50 10 5(F), p. 98, states that a debt is not "delinquent" if "[t]he obligor is subject to, or has been discharged in, a bankruptcy proceeding" (AP # 20-1003, doc. # 36, ¶ 32, doc. # 41, doc. # 48-1, ¶ 32).

10. By e-mail dated April 13, 2020, Berkshire Bank advised SH that it denied the application based on SH's status as a chapter 11 debtor and the "yes" answer to question 2 (AP # 20-1003, doc. # 36, ¶ 40, doc. # 41, doc. # 48-1, ¶ 40).

11. On April 21, 2020, SMCS contacted Mascoma, a commercial banking institution, regarding SMCS's PPP application. Mascoma informed SMCS by e-mail the same day that Mascoma was "informed [by] the SBA that business customers currently in bankruptcy are ineligible." On or around April 30, 2020, SMCS received a letter from Mascoma stating that SMCS "does not qualify for a PPP loan because of

---

[5] The Defendant objects to the characterization of the funds as a "forgivable grant" in the Plaintiffs' statements of fact. Although SMCS redacts the entire paragraph in response (see AP # 20-1004, doc. # 45, ¶ 21), the Court finds this unnecessary as the remainder of the paragraph is undisputed.

[its] affirmative answer to Question #1 on the PPP Application" (AP # 20-1004, doc. # 32, ¶¶ 28–29, doc. # 39, doc. # 45-1, ¶¶ 28–29).

12. SMCS was prohibited from having a PPP application processed or approved based solely on its status as a debtor (AP # 20-1004, doc. # 32, ¶ 28, doc. # 39, doc. # 45-1, ¶ 28).

13. On or about April 23, 2020, Congress enacted legislation making additional funds available for the PPP (AP # 20-1003, doc. # 36, ¶ 43, doc. # 41, doc. # 48-1, ¶ 43; AP # 20-1004, doc. # 32, ¶ 36, doc. # 39, doc. # 45-1, ¶ 36).

14. On April 24, 2020, the SBA promulgated an interim final rule (the "April 24 Rule") with respect to PPP. The April 24 Rule states that "[i]f the applicant or the owner of the applicant is the debtor in a bankruptcy proceeding, either at the time it submits the application or at any time before the loan is disbursed, the applicant is ineligible to receive a PPP loan." The stated basis for this rule is that the Defendant "determined that providing PPP loans to debtors in bankruptcy would present an unacceptably high risk of an unauthorized use of funds or non-repayment of unforgiven loans" (AP # 20-1003, doc. # 36, ¶ 45, doc. # 41, doc. # 48-1, ¶ 45; AP # 20-1004, doc. # 32, ¶ 39, doc. # 39, doc. # 45-1, ¶ 39).

15. On May 4, 2020, the Court issued its TRO in the SH adversary proceeding. Subsequently, SH submitted an application for PPP to Berkshire Bank indicating "no" on Question 1 and correcting its response to indicate "no" on Question 2, based on its review of the SBA's official guidance, but SH subsequently learned that Berkshire Bank was no longer processing PPP applications, so it submitted an application with the same changes to Mascoma (AP # 20-1003, doc. # 36, ¶¶ 34, 51–52, doc. # 41, doc. # 48-1, ¶¶ 34, 51–52).

16. On May 7, 2020, the Court issued its TRO in the SMCS adversary proceeding. On May 12, 2020, SMCS submitted a new application for PPP funds to Mascoma. In the application, SMCS answered "no" on Question 1 in accordance with the TRO (AP # 20-1004, doc. # 32, ¶¶ 40–41, doc. # 39, doc. # 45-1, ¶¶ 40–41).

17. On May 15, 2020, Mascoma submitted both SH and SMCS's PPP applications to SBA's E-tran system and obtained electronic approval of SH and SMCS's participation in the PPP. This confirms that once bankruptcy status was removed from consideration (and SH's response to question 2 was corrected), SH and SMCS were and are eligible for PPP (AP # 20-1003, doc. # 48, ¶ 16, doc. # 54, p. 5, doc. # 56; AP # 20-1004, doc. # 45, ¶ 16, doc. # 52, p. 5, doc. # 54).

18. Subsequent to May 15, 2020, SBA adopted a rule governing forgiveness under § 1106 of the CARES Act (the "Forgiveness Rule.") The Forgiveness Rule states: "If SBA determines in the course of its review that the borrower was ineligible for the PPP loan based on the provisions of the CARES Act, SBA rules or guidance available at the time of the borrower's loan application, or the terms of the borrower's PPP loan application (for example, because the borrower lacked an adequate basis for the certifications that it made in its PPP loan application), the loan will not be eligible for loan forgiveness" (AP # 20-1003, doc. # 48, ¶ 17, doc. # 56; AP # 20-1004, doc. # 45, ¶ 17, doc. # 54).

19. SMCS's reorganization efforts, and both Plaintiffs' exits from chapter 11, have been negatively impacted by the economic consequences stemming from the novel coronavirus that causes the disease Covid-19 (AP # 20-1003, doc. # 36, ¶ 11, doc. # 41, doc. # 48-1, ¶ 11; AP # 20-1004, doc. # 32, ¶ 12, doc. # 39, doc. # 45, ¶ 12).

20. A significant portion of SH's revenue, and nearly all of SMCS's revenue, is derived from outpatient procedures and non-essential office visits or medical procedures. Following recommendations and/or orders from the federal Centers for Disease Control and the State of Vermont, non-essential medical procedures and office visits have been postponed, rescheduled, or canceled. These cancelations and deferrals have had, and are expected to continue to have, a negative impact on the Plaintiffs' cash

receipts (AP # 20-1003, doc. # 36, ¶ 12, doc. # 41, doc. # 48-1, ¶ 12; AP # 20-1004, doc. # 32, ¶ 13, doc. # 39, doc. # 45, ¶ 13).

21. The Plaintiffs do not yet know when business operations will normalize or what the Plaintiffs' revenues will be at that time. Even if all limitations, recommendations, or restrictions on the provision of services are lifted, the Plaintiffs have experienced an unforeseen, drastic and material drop in cash receipts due to Covid-19 and may continue to experience negative impacts to revenue. Further, it seems probable to the Plaintiffs' interim/acting CEOs that some patients will be less likely to seek services until more is known about Covid-19, its transmission, and the potential for a vaccine. As a result, the Plaintiffs face financial challenges that have been materially and significantly exacerbated by Covid-19 (AP # 20-1003, doc. # 36, ¶¶ 13–14, doc. # 41, doc. # 48-1, ¶¶ 13–14; AP # 20-1004, doc. # 32, ¶ 14, doc. # 39, doc. # 45, ¶ 14).

22. PPP funds are available on a first come, first served basis. Neither Plaintiff received PPP funds prior to the funds being exhausted under the first tranche of PPP funding. The Plaintiffs' interim/acting CEOs are concerned about the impact it will have on the Plaintiffs if SH and SMCS are unable to obtain PPP funds in the second tranche of funding or prior to the program end date of June 30, 2020 (AP # 20-1003, doc. # 36, ¶ 35, doc. # 41, doc. # 48-1, ¶ 35; AP # 20-1004, doc. # 32, ¶ 30, doc. # 39, doc. # 45, ¶ 30).

23. Between the date SH filed its Complaint and May 14, 2020, SH received approximately $4.3 million in federal stimulus funds for rural hospitals. There are restrictions as to how SH can use those funds (AP # 20-1003, doc. # 36, ¶¶ 54–55, doc. # 41, doc. # 48-1, ¶¶ 54–55).

24. Between the date SMCS filed its Complaint and May 14, 2020, SMCS received approximately $1.3 million in federal stimulus funds for rural healthcare providers. In addition, on or around April 23, 2020, SMCS borrowed approximately $498,800 in the form of a prospective Medicaid payment (the "Retainer Funds") pursuant to the State of Vermont's Medicaid retainer program implemented in response to the Covid-19 pandemic. SMCS understands that it may be required to repay the Retainer Funds through the State of Vermont exercising recoupment rights against future Medicaid payments. SMCS has also received additional funding from the Health Resources & Services Administration. SMCS continues to explore other potential sources of emergency funding to help it manage the impact of Covid-19. For example, it was informed on or around May 7, 2020, that it would receive a grant from the federal government in the approximate amount of $531,000 to be used toward expanding testing capabilities at its facilities for Covid-19 (AP # 20-1004, doc. # 32, ¶ 45, doc. # 39, doc. # 45, ¶ 45).

25. The additional funds have staved off the immediate risk of closure as raised the Complaints, but do not guaranty or ensure a successful future outcome for the Plaintiffs. The Plaintiffs' futures are still highly uncertain and closure is still possible, though less immediate, because it is unknown when the Plaintiffs' business operations will normalize or what the Plaintiffs' revenues will be like at that time (AP # 20-1003, doc. # 36, ¶ 55, doc. # 41, doc. # 48-1, ¶ 55; AP # 20-1004, doc. # 32, ¶ 30, doc. # 39, doc. # 45, ¶ 30).

26. Obtaining the PPP funds would provide additional, needed liquidity to the Plaintiffs and, in the views of their interim/acting CEOs, would likely help facilitate the Plaintiffs' successful reorganizations. For SH, PPP funds would not be the sole determining factor of a successful exit from chapter 11, but cash availability remains a significant problem and additional liquidity is needed and would help. Due to Covid-19 and the unavailability of PPP funds thus far, the Plaintiffs have been required to spend their limited existing cash – including, for SH, funds borrowed from the State of Vermont – on immediate business operations, including payroll (AP # 20-1003, doc. # 36, ¶ 56, doc. # 41, doc. # 48-1, ¶ 56; AP # 20-1004, doc. # 32, ¶ 47, doc. # 39, doc. # 45, ¶ 47).

27. As healthcare professionals, the Plaintiffs' interim/acting CEOs expect Covid-19 will continue to be prevalent for at least the next 12–18 months, i.e., through June–December 2021, and until such time as

there is widespread treatment and a vaccine. Cold and flu season in the fall and winter of 2020 could very likely now be cold, flu, and Covid-19 season, with commensurate negative impacts to the Plaintiffs' businesses to the extent that non-essential services are paused again or patients do not feel safe seeking medical treatment (AP # 20-1003, doc. # 36, ¶ 57, doc. # 41, doc. # 48-1, ¶ 57; AP # 20-1004, doc. # 32, ¶ 48, doc. # 39, doc. # 45, ¶ 48).

## DISCUSSION

### A. The Defendant is in Violation of § 525(a)

The Plaintiffs argue the Defendant is violating § 525(a) by excluding bankruptcy debtors from participating in the PPP (AP # 20-1003, doc. # 48, p. 2; AP # 20-1004, doc. # 45, p. 2). The Defendant argues § 525 does not apply to the PPP (AP # 20-1003, doc. # 56, p. 3; AP # 20-1004, doc. # 54, p. 3).

Section 525(a) provides, in relevant part, that

> a governmental unit may not deny … a license, permit, charter, franchise, or other similar grant to … a person that is or has been a debtor under this title … solely because such … debtor is or has been a debtor under this title[.]

11 U.S.C. § 525(a).

There is no question the SBA, as an agency of the United States, is a governmental unit as defined in § 101(27), and the Plaintiffs, as Vermont non-profit business corporations, are persons as defined in § 101(41) (UMF ¶¶ 1–3). Further, the parties do not dispute the Plaintiffs' status as debtors in a case under Title 11 was the basis for their exclusion from PPP (UMF ¶¶ 8–12, 15–17). Thus, the salient question before the Court is whether, as a matter of law, the PPP is "a license, permit, charter, franchise, or other similar grant" within the meaning of § 525(a).

#### 1. *Other Pending or Recently Decided PPP-Related Proceedings*

The Defendant asserts in her memorandum that "the tide has taken a significant and dramatic turn" on PPP cases, citing 18 recent decisions in which courts have refused to grant injunctive relief to debtors, and asserting that four of the five recent cases she identified granting injunctive relief either found the debtors were unlikely to succeed under § 525(a) or did not base their decision on that provision (AP # 20-1003, doc. # 56, pp. 2–3; AP # 20-1004, doc. # 54, pp. 2–3). At the oral arguments held on June 10, 2020, SH contested the characterization of these cases as a tidal wave against the Plaintiffs, and argued many of the 18 decisions the Defendant referenced were in a different procedural posture, did not articulate a rationale, or were mandated by binding Circuit law that differed from the pertinent Second Circuit jurisprudence. SH also pointed out there had been several recent decisions that were favorable to the Plaintiffs, which the Defendant had not identified.

Given the widespread and ongoing litigation of the instant issues in courts nationwide, as well as the parties' differing characterizations of the trends they indicate, the Court begins its analysis of the Plaintiffs' § 525(a) claims with a survey of those recent decisions.

The Court is aware of 34 other pending or recently decided PPP-related proceedings that address

§ 525(a). Within the Second Circuit, the Court has identified only two other such proceedings. In <u>Eastern Niagara Hosp., Inc.</u>, 20-ap-01020 (Bankr. W.D.N.Y.), the court has scheduled a hearing for June 30, 2020 on the plaintiff's motion for a preliminary injunction based on its § 525(a) and APA claims, so no decision has yet issued. In <u>The Diocese of Rochester, et al.</u>, 20-cv-06243 (W.D.N.Y. June 10, 2020), the plaintiffs commenced a proceeding in district court, which withdrew the reference to the bankruptcy court, denied the plaintiffs' motion for a preliminary injunction, and granted summary judgment in favor of the defendant on the plaintiffs' APA and § 525(a) claims. The remaining 32 decisions reflect a variety of perspectives and outcomes, driven largely by binding circuit precedent, which cannot be accurately described as clearly favoring or defeating the SBA's position on whether the PPP discriminates against debtors in violation of § 525. The Court therefore analyzes these PPP-related § 525 cases by circuit.

The Court is aware of three recent decisions adjudicating this issue within the First Circuit. In <u>Organic Power LLC</u>, 20-ap-00055 (Bankr. D.P.R. May 8, 2020), the bankruptcy court granted the plaintiff's request for a TRO based on both its § 525(a) and APA claims. By contrast, in <u>Breda, LLC</u>, 20-ap-01008 (Bankr. D. Me. May 11, 2020), the bankruptcy court denied the plaintiff's TRO, finding the plaintiff had failed to show irreparable harm. Finally, while it had originally granting TROs in the consolidated proceedings in <u>Penobscot Valley Hosp.</u>, 20-ap-01005 and <u>Calais Reg'l Hosp.</u>, 20-ap-01006 (Bankr. D. Me.), on June 3, 2020, the bankruptcy court issued joint proposed findings of fact and conclusions of law in favor of the Defendant on both the plaintiffs' APA and § 525(a) claims. In sum, the cases in the First Circuit are split on this issue.

In the Third Circuit, the court in <u>Cosi Inc.</u>, 20-ap-50591 (Bankr. D. Del. May 14, 2020) denied the plaintiff's request for a TRO under § 525, with the bankruptcy court pointing to the nature of the debtor's business being other than a frontline Covid-19 responder as a significant factor in its denial of relief:

> The life-and-death considerations that were before Judge Jones [in Hidalgo] are not present in this case. Were I faced with similar facts, to be candid, I would likely grant the temporary restraining order on the grounds that the public policy prong [swamps] the other prongs and drives the injunction analysis[.]

<u>Cosi</u>, 20-ap-50591 (transcript of April 30, 2020 hearing at p. 62, lines 3–9). In <u>Aspen Landscaping Contracting, Inc.</u>, 20-ap-01277 (Bankr. D.N.J.), the court issued an order to show cause on the plaintiff's request for a TRO and preliminary injunction, but the parties agreed to voluntarily dismiss the proceeding prior to any decision on the merits of the plaintiff's claims. Hence, these cases do not give any weight to either party's position in the instant proceedings.

There appears to be just one decision within the Fourth Circuit, <u>iThrive Health, LLC</u>, 20-ap-00151 (Bankr. D. Md. June 8, 2020). In that proceeding, the court denied the plaintiff's request for a preliminary injunction, finding the plaintiff was unlikely to succeed on the merits of its § 525(a) claim based on Fourth Circuit precedent in <u>Ayes v. U.S. Dep't of Veterans Affairs</u>, 473 F.3d 104 (4th Cir. 2006).

In the Fifth Circuit, there are a total of nine cases, at several different procedural stages. In the first case in the country, <u>Hidalgo Cty. Emergency Svc. Foundation</u>, 20-ap-02006 (Bankr. S.D. Tex.), Judge David R. Jones granted the plaintiff's request for a TRO at a hearing held on April 24, 2020, and subsequently issued a preliminary injunction on May 8, 2020, based on the plaintiff's § 525(a) and APA claims.[6] Ten days later, Judge Jones also granted the plaintiff's request for a TRO in In <u>KP Engineering, LP</u>, 20-ap-03120 (Bankr. S.D. Tex. May 18, 2020), and subsequently, on consent of the parties, granted the plaintiff's request for a preliminary injunction in that case. The remaining proceedings within the Fifth Circuit have been decided in favor of the Defendant: <u>Trudy's Texas Star, Inc.</u>, 20-ap-01026 (Bankr. W.D. Tex. May 7, 2020) (narrowly construing § 525(a) based on Fifth Circuit precedent in <u>In re Exquisito Services, Inc.</u>, 823 F.2d 151 (5th Cir. 1987), and denying TRO); <u>Asteria Educ., Inc.</u>, 20-ap-05024 (Bankr. W.D. Tex.) (narrowly construing § 525(a) based on Fifth Circuit precedent and denying TRO); <u>Okorie</u>, 20-ap-06015, and <u>Inland Family Practice Ctr., LLC</u>, 20-ap-06016 (Bankr. S.D. Miss. May 18, 2020) (denying TRO in summary order); <u>Abe's Boat Rentals, Inc.</u>, 20-ap-01029 (Bankr. E.D. La. May 19, 2020) (adopting <u>Trudy's</u> and <u>Asteria</u> reasoning); <u>J-H-J, Inc., et al.</u>, 20-ap-05014 (Bankr. W.D. La. May 20, 2020) (same); <u>Jack Cty. Hosp. District</u>, 20-ap-04035 (Bankr. N.D. Tex. May 21, 2020) (denying TRO in summary order). This Court finds it significant that each of these rulings in favor of the Defendant that articulated a rationale appears to be premised on the trial court's determination that it was bound by Fifth Circuit precedent in <u>Exquisito.</u>

The Court has identified five PPP-related proceedings within the Sixth Circuit. Two of them were decided in favor of the SBA: In <u>Areway Acquisition, Inc., et al.</u>, 20-ap-01037 (Bankr. N.D. Ohio May 20, 2020), the court denied the plaintiffs' request for a TRO and preliminary injunction in a summary order. In <u>Hartshorne Holdings, LLC, et al.</u>, 20-ap-04012 (Bankr. W.D. Ky. June 1, 2020), the court had originally granted the plaintiffs' TRO request, but subsequently denied their request for a preliminary injunction based on a finding the plaintiff had failed to show a likelihood of irreparable harm. The three other proceedings within the Sixth Circuit were decided in favor of the plaintiffs. While the court in <u>Weather King Heating & Air, Inc.</u>, 20-ap-05023 (Bankr. N.D. Ohio May 22, 2020) granted a preliminary injunction based only on the plaintiffs' APA claim, and found the plaintiff was unlikely to succeed on merits of § 525(a) claim based on binding Sixth Circuit precedent in <u>Toth v. Mich. State Housing Dev. Auth.</u>, 136 F.3d 477 (6th Cir. 1998)), in the other two cases, relief was granted on both the § 525 and APA claims, see <u>St. Alexius Hosp. Corp. #1</u>, 20-ap-06005 (Bankr. E.D. Ky. May 22, 2020)[7] and <u>Alpha Visions Learning Academy, Inc.</u>, 20-ap-00071 (Bankr. W.D. Tenn. June 3, 2020). In the latter decision,

---

[6] The district court subsequently granted both the defendant's request for a stay of the preliminary injunction pending appeal and the plaintiff's request for certification for direct appeal to the Fifth Circuit.

[7] The plaintiff subsequently voluntarily dismissed its adversary proceeding without prejudice.

Judge Latta concluded the Sixth Circuit's decision in Toth did not require a determination that §525(a) does not apply to the PPP. Hence, the caselaw in the Sixth Circuit does not markedly favor the Defendant and, to the extent the SBA prevailed there, it did so because of Sixth Circuit precedent construing §525(a) quite narrowly.

All four decisions issued thus far in the Seventh Circuit have ruled against the plaintiffs on their §525(a) claims. A bankruptcy court there issued a joint decision in favor of the Defendant on the plaintiffs' § 525(a) claims in Schuessler et al., 20-ap-02065, Steffen, et al., 20-ap-02068, and Thull Farms, LLC, 20-ap-02069 (Bankr. E.D. Wis. May 22, 2020), agreeing with the Cosi and Trudy's courts and applying the interpretation of § 525(a) adopted by the Third, Fourth, and Sixth Circuits in Watts v. Penn. Housing Fin. Co., 876 F.2d 1090 (3d Cir. 1989), Ayes, and Toth, respectively.[8] Likewise, in USA Gymnastics, 20-ap-50055 (Bankr. S.D. Ind. June 12, 2020), the court denied the plaintiff's request for a preliminary injunction on its § 525(a) claim (and issued proposed findings in favor of the plaintiff's request for a preliminary injunction on its APA claim).

The Court has identified only one proceeding on the § 525(a) PPP issue within the Eighth Circuit, Dancor Transit, Inc., 20-ap-07024 (Bankr. W.D. Ark.). There, the court scheduled a hearing on the plaintiff's request for a TRO on May 27, 2020 and has not yet issued a ruling on the docket.

The Court is aware of five PPP-related proceedings within the Ninth Circuit. Of these, three have been decided in favor of the Defendant: NAI Capital, Inc., 20-ap-01051 (Bankr. C.D. Cal. May 20, 2020) (denying TRO in summary order); Starplex Corp., 20-ap-00095 (Bankr. D. Ariz. May 26, 2020) (denying preliminary injunction on § 525(a) and APA claims); PPV, Inc., et al., 20-ap-03054 (Bankr. D. Oreg. June 1, 2020) (denying TRO in summary order). The remaining two cases were decided in favor of the plaintiffs based on their APA claims: Astria Health, et al., 20-ap-80016 (Bankr. E.D. Wash. June 10, 2020) (finding plaintiffs not likely to succeed on § 525(a) claim but granting preliminary injunction based on APA claim);[9] and PCT Int'l, Inc., 20-ap-00118 (Bankr. D. Ariz. June 12, 2020) (finding § 525(a) inapplicable to PPP but issuing declaratory judgment in favor of plaintiff based on APA claim).

The Court has only identified one decision within the Tenth Circuit, Roman Catholic Church of the Archdiocese of Santa Fe, 20-ap-01026 (Bankr. D.N.M. May 1, 2020). In that case, the court converted the plaintiff's request for a preliminary injunction to a trial on the merits and issued an opinion in favor of the plaintiff on both its § 525(a) and APA claims.

In the Eleventh Circuit, the court in NRP Lease Holdings, LLC, et al., 20-ap-00055 (Bankr. M.D. Fla May 27, 2020), granted the plaintiffs' request for preliminary injunction based on their APA claims, and was silent on the plaintiffs' § 525(a) claims. In Gateway Radiology Consultants P.A., 20-ap-00330

---

[8] The court also issued a report and recommendation in favor of the Defendant on the plaintiffs' APA claims.
[9] The court also certified the preliminary injunction order for direct appeal to the Ninth Circuit.

(Bankr. M.D. Fla. June 8, 2020), the court found the plaintiff showed a substantial likelihood of success on the merits of its APA claims, and thus declined to address the plaintiff's § 525(a) claim on a preliminary basis. In the remaining proceeding, <u>Henry Anesthesia Assocs. LLC</u>, 20-ap-06084 (Bankr. N.D. Ga. June 4, 2020), the court denied the plaintiff's request for a preliminary injunction on both its § 525(a) and APA claims.

Of these 34 decisions, three are awaiting decision, or were voluntarily dismissed prior to a ruling on the merits. Twelve of the remaining 31 decisions have been decided in favor of the plaintiffs, including six based at least in part on their § 525(a) claims, two based on their APA claims without a ruling on their § 525(a) claims, and four based on their APA claims but finding relief not warranted on their § 525(a) claims. Nineteen decisions denied injunctive relief to the plaintiffs, with 11 of those denials emanating from within the Third, Fourth, Fifth, and Sixth Circuits, where the Defendant asserted <u>Watts</u>, <u>Ayes</u>, <u>Exquisito</u>, and <u>Toth</u>, respectively, preclude application of § 525(a) to the PPP (and, as noted above, some bankruptcy courts determined they were bound by Circuit precedent to deny the plaintiffs' § 525(a) claims).

The Court does not view these 34 decisions as a tidal shift of cases in favor of the Defendant. On the contrary, the Court finds this set of cases to reflect a wide spectrum of rationales and conclusions across the courts, some of which are persuasive to this Court (as discussed below), but none of which are binding. Against this survey of recent decisions, the Court turns to the pertinent Second Circuit case law addressing § 525(a).

### 2.  The Second Circuit's Decisions in <u>Goldrich</u> and <u>Stoltz</u>

The Plaintiffs argue the controlling statement on the scope of § 525(a) is found in <u>Stoltz v. Brattleboro Housing Auth. (In re Stoltz)</u>, 315 F.3d 80 (2d Cir. 2002), in which the Second Circuit held a public housing lease was an "other similar grant" under § 525(a) (AP # 20-1003, doc. # 48, pp. 11–12, 15; AP # 20-1004, doc. # 45, pp. 12–13, 16). The Defendant contends § 525(a) does not apply to the PPP based on an earlier Second Circuit decision, <u>In re Goldrich</u>, 771 F.2d 28 (2d Cir. 1985), in which the Second Circuit declined to extend § 525 to student loan guarantees (AP # 20-1003, doc. # 56, pp. 8, 10, 12–13, 15–16; AP # 20-1004, doc. # 54, pp. 8, 10, 12–13, 15–16). These two Second Circuit cases turn on markedly different analyses of § 525(a), which this Court must harmonize in order to determine the appropriate framework against which to analyze the merits of the Plaintiffs' § 525(a) claims.[10]

In the Second Circuit's 1985 <u>Goldrich</u> decision, the appellee had obtained a student loan guaranteed by appellant state education service. <u>Goldrich</u>, 771 F.2d at 28–29. The appellee defaulted on

---

[10] In <u>The Diocese of Rochester, et al.</u>, 20-cv-06243 (W.D.N.Y. June 10, 2020), the district court cited <u>Goldrich</u> and <u>Stoltz</u> and briefly addressed Congressional disapproval of <u>Goldrich</u> in a footnote, <u>id.</u> at doc. # 42, pp. 19–20, n. 4, but did not further analyze those cases in its decision denying the plaintiffs' request for preliminary injunction.

the loan, and later filed for bankruptcy relief and, as part of that case, he obtained a discharge of his unsecured loan debt, including the unpaid student loan. Id. at 29. Both before and after his discharge, various banks accepted other loan applications from the appellee, but the appellant governmental entity refused to guarantee the loans based on a state law that eliminated eligibility for loans while an applicant was in default status. Id.

The Second Circuit found § 525 did not promise protection against consideration of a prior bankruptcy filing in post-discharge credit arrangements, because a credit guarantee was not a license, permit, charter, or franchise, and was not in any way similar to those grants. Goldrich, 771 F.2d at 30. The Second Circuit concluded the enumerated list in § 525(a) was composed solely of benefits conferred by the state that were unrelated to credit, and found Congress' failure to manifest any intention to include benefits of a distinctly different character was unambiguous. Id. The court determined that while Congress may have intended to allow expansion of the scope of § 525, it also clearly intended such expansion would be limited to situations sufficiently similar to Perez to fall within the enumeration, and found the extension of credit at issue before it was manifestly different from both examples given in the Senate Report, i.e., licensing and exclusion from a union. Id. at 30–31.

In 1994, Congress signaled its disapproval of Goldrich by enacting § 525(c), as the Second Circuit specifically acknowledged in Stoltz:

> Although courts and commentators generally refer to section 525(a) as the antidiscrimination provision, section 525 contains two additional antidiscrimination provisions, which were added after the 1978 enactment of section 525(a). Section 525(b), enacted in 1984, prohibits discrimination against debtors by private employers. 11 U.S.C. § 525(b) (1999). Section 525(c), enacted in 1994, prohibits discrimination against debtor-borrowers on the basis of discharged, unpaid loans by governmental units operating a student loan or grant program. 11 U.S.C. § 525(c) (2001). **Section 525(c) signaled congressional disapproval of Goldrich v. New York State Higher Educ. Servs. Corp., 771 F.2d 28 (2d Cir. 1985), in which this Court had narrowly construed section 525(a)'s "other similar grant" language to not include extensions of credit. Neither section 525(b) nor section 525(c) is implicated by this appeal**.

Stoltz, 315 F.3d at 86, n. 2 (emphasis added).

In the bankruptcy case underlying the Second Circuit's 2002 Stoltz decision, this Court had narrowly construed § 525(a), reasoning that § 525(a) did not protect debtor-tenants from eviction by public housing authorities for nonpayment of prepetition rent and granting the defendant housing authority's motion for relief from stay. Stoltz, 315 F.3d at 83. The District Court reversed and reinstated the automatic stay, thereby preventing the eviction, holding that § 525(a) did prohibit a public housing authority from evicting a debtor-tenant from public housing based on nonpayment of discharged, prepetition rent. Id. at 84. The Second Circuit affirmed the District Court, finding this Court had construed § 525(a) too narrowly and further concluding § 525(a) controlled over § 365 and precluded the

14

housing authority from evicting the debtor-tenant. Id.

The Second Circuit in Stoltz began its analysis of § 525(a) by reviewing the development of the antidiscrimination provision, starting with the codification of Perez v. Campbell, 402 U.S. 637 (1971). The Second Circuit observed that in Perez, the Supreme Court struck down a state statute that withheld driving privileges from debtors who failed to satisfy motor-vehicle-related tort judgments discharged under bankruptcy law, finding that statute discriminated against debtors in a manner contrary to "fresh start" principles, and concluded Congress had signaled its approval of Perez by subsequently enacting § 525(a). Stoltz, 315 F.3d at 87. The Second Circuit found it notable that the text of § 525(a) did not limit its scope to the facts presented in Perez, but instead applied to any governmental unit and covered not only licenses, but also permits, charters, franchises, and other similar grants, and applied regardless of whether the governmental unit involved was the creditor or a grantor conditioning a grant on the debtor's satisfaction of a discharged debt owed to a third party. Id. The Second Circuit then reviewed case law development construing § 525(a) since its enactment, pointing out that courts had interpreted it to protect debtors from discrimination in a wide variety of contexts, including a debtor's right to operate a motor vehicle, a debtor's ability to engage in a trade or business, and a debtor's ability to obtain essential goods and services. Id. at 87–88. However, the court opined, the scope of § 525(a)'s protection in the context of public housing was unsettled. Id. at 88.

Turning to the public housing lease at issue, the Second Circuit rejected the housing authority's argument that the eviction it sought was not proscribed by § 525(a) because a public housing lease is not an "other similar grant" within the meaning of that provision. Stoltz, 315 F.3d at 89. The court described the housing authority's proposed construction of § 525(a) as "artificially narrow" because "the plain language of the provision indicates that eviction would revoke a protected grant, i.e., the lease, in violation of section 525(a)." Id.

In its analysis of the plain language of § 525(a), the Second Circuit began with the premise that the term "other similar grant" was not defined by the Bankruptcy Code. Stoltz, 315 F.3d at 89. The court did not find this surprising:

> The omission of a statutory definition for the term "other similar grant" is unsurprising in light of the antidiscrimination provision's legislative history, which indicates that "… the section is not exhaustive. The enumeration of various forms of discrimination against former bankrupts is not intended to permit other forms of discrimination …" and delegates to the judiciary the responsibility "to mark the contours of the anti-discrimination provision in pursuit of sound bankruptcy policy." H. Rep. No. 95-595, at 366-67 (1977), reprinted in 1978 U.S.C.C.A.N. 5787, 6323.

Id. at p. 89, n. 4. The Second Circuit looked first at the meaning of "grant," finding:

> In common parlance, a grant is "a transfer of property by deed or writing." Merriam Webster's Collegiate Dictionary 507 (10th ed. 2000). As a legal term, a grant is "an

15

> agreement that creates a right of any description other than the one held by the grantor. Examples include **leases**, easements, charges, patents, franchises, powers, and licenses." Black's Law Dictionary 707 (7th ed. 1999) (emphasis added). Similarly, a lease is "[a] contract by which a rightful possessor of real property conveys the right to use and occupy that property in exchange for consideration." Id. at 898. Thus, a public housing lease is a grant by which a public housing authority conveys to a public housing tenant the right to use and occupy public housing in exchange for rent. The only question that remains is whether a public housing lease is a grant "similar" to a "license, permit, charter, [or] franchise."

Id. at 89–90 (emphasis in original).

In answering the question of whether a public housing lease is a grant "similar" to a "license, permit, charter, [or] franchise" in the affirmative, the Second Circuit in Stoltz found two factors to be determinative – the public housing lease at issue was (1) unobtainable from the private sector and (2) essential to the debtor's fresh start:

> The common qualities of the property interests protected under section 525(a), i.e., "licenses, permits, charters, franchises, and other similar grants," are that these property interests are unobtainable from the private sector and essential to a debtor's fresh start. For instance, a real estate license, state university transcript, or driver's license may only be obtained from a particular governmental unit. A debtor who cannot obtain her real estate license will be unable to pursue her chosen profession; a debtor who cannot obtain his transcript will be unable to apply for certain jobs or further schooling; a debtor who cannot obtain a driver's license will be unable to commute to many jobs or school.

> Public housing leases, too, are property interests unobtainable from the private sector and essential to a debtor's fresh start. Public housing leases are, by definition, obtainable only from governmental entities. Furthermore, a public housing lease is essential to a debtor's fresh start. An individual qualifies for public housing because he or she cannot afford housing at prevailing market rates. In light of the notoriously lengthy waiting lists that may exist for public housing, see, e.g., Housing Auth. Of Pittsburgh v. Collins (In re Collins), 199 B.R. 561, 568 n.13 (Bankr. W.D. Pa. 1996), an evicted debtor-tenant, along with any [dependents], would quite possibly become homeless – a status not conducive to economic survival. A debtor-tenant's future right to participate in public housing programs – on a space available basis – would therefore be of little or no practical value upon eviction. A debtor-tenant's "entire economic status [therefore] is dependent on" his or her current public housing lease, In re Day, 208 B.R. 358, 367 (Bankr. E.D. Pa. 1997), which is his or her "single most significant material possession," In re Whitsett, 163 B.R. 752, 755 (Bankr. E.D. Pa. 1994). Eviction-induced homelessness would "seriously affect the debtors' livelihood [and] fresh start." H. Rep. No. 95-595, at 367 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6268. Conversely, preventing homelessness promotes the Code's fresh start policy by helping debtors maintain steady employment and self-sufficiency.

Stoltz, 315 F.3d at 90.

Since the Second Circuit found the plain text of § 525(a) compelled the conclusion that a public housing lease, and the debtor-tenant's current right to participate in the public housing program, was a

16

protected grant, the court found it unnecessary to delve into § 525's legislative history. Stoltz, 315 F.3d at

92. However, the Second Circuit went on to find the legislative history supported its interpretation of

"other similar grants" as inclusive of public housing leases:

> The legislative history specifically rejects a narrow construction of the
> antidiscrimination provision and makes clear that 525(a) protects the debtor's fresh
> start.
>
>> Section [525(a)] is not exhaustive. The enumeration of various
>> forms of discrimination against former bankrupts is not intended to
>> permit other forms of discrimination. The courts have been
>> developing the Perez rule. This section permits further development
>> to prohibit actions by governmental or quasi-governmental
>> organizations that perform licensing functions, such as a state bar
>> association or a medical society, or by other organizations that can
>> seriously affect the debtors' livelihood or fresh start, such as
>> exclusion from a union on the basis of discharge of a debt to the
>> union's credit union. The effect of the section, and of further
>> interpretations of the Perez rule, is to strengthen the anti-reaffirmation
>> policy found in section 524(b). Discrimination based solely on
>> nonpayment could encourage reaffirmations, contrary to the
>> expressed policy.
>
> H. Rep. No. 95-595, at 367 (1977), reprinted in 1978 U.S.C.C.A.N. 5787, 6323.

Id. at 92, n. 6 (modification in original).

In this Court's view, Stoltz clearly denotes the Second Circuit's departure from – and disapproval

of – its earlier narrow construction of § 525(a) in Goldrich. At the beginning of its discussion in Stoltz,

the Second Circuit points out that in Goldrich it had previously "**narrowly construed** section 525's 'other

similar grant' language," and Congress had signaled disapproval of Goldrich by enacting § 525(c). Stoltz,

315 F.3d at 86, n. 2 (emphasis added). The Second Circuit in Stoltz then proceeds to reject, at multiple

points throughout its decision, a narrow construction of § 525(a): it (i) expressly rejects the housing

authority's "artificially narrow construction of section 525(a)" based on the plain language of that

provision, (ii) asserts "the legislative history fully supports [the court in Stoltz's] interpretation of 'other

similar grants'" as it "specifically rejects a narrow construction" of § 525(a); and (iii) concludes that this

Court, in the underlying bankruptcy case, had "construed section 525(a) too narrowly." Id. at 84, 89, 92,

n.6. Otherwise, the Second Circuit in Stoltz does not reference Goldrich at all, and at no point does it

follow or even reference its earlier § 525(a) analysis in that case.

Although the Second Circuit found in Goldrich, in 1985, that Congress "clearly intended such

expansion would be limited to situations sufficiently similar to Perez to fall within the enumeration" of

§ 525(a), Goldrich, 771 F.2d at 30–31, by 2002 the Second Circuit in Stoltz had the benefit of hindsight,

and Congress's clear message – issued with enactment of § 525(c) in 1994 – disagreeing with the Second

Circuit's earlier interpretation of Congressional intent. See Stoltz, 315 F.3d at 86, n. 2. The Second

Circuit in Stoltz takes a much broader view of Perez, and the items enumerated in § 525(a), than it had taken 17 years earlier in Goldrich, finding that "[n]otably, the text of Section 525(a) does not limit its scope to the facts presented in Perez," and "section 525(a) has been interpreted by the courts to protect debtors from discrimination in a wide variety of contexts." Stoltz, 315 F.3d at 87.

Moreover, even absent this Court's conclusion that Stoltz signals the Second Circuit's departure from its earlier legal analysis in Goldrich, the Court finds the PPP is only superficially similar to the commercial extension of credit at issue in Goldrich, and is in fact much more akin to the public housing lease in Stoltz.

In Goldrich, the appellee initially obtained a student loan from First National City Bank, which was guaranteed by the appellant state education service. Goldrich, 771 F.2d at 28–29. The bankruptcy court's proposed findings indicated that loan carried 7.5% interest, 45 B.R. 514, 516 (Bankr. E.D.N.Y. 1984), which was not controverted by the Second Circuit decision. After the appellee's bankruptcy discharge, he sought additional student loan funds from, and his applications were accepted by, various New York banks. Goldrich, 771 F.2d at 29. Nothing in Goldrich indicates the student loans at issue in that case were other than an extension of credit on market terms, available in the private sector.

By contrast, the CARES Act was not enacted to increase the availability of commercial loans.[11] Rather, it includes stimulus funds designed to assist businesses and ensure American workers continue to be paid, despite the economic impact of Covid-19 and social distancing measures (UMF ¶5). The CARES Act establishes the PPP as a convertible loan program with no repayment obligations for PPP disbursements if, among other things, the funds are used for payroll and wage expenses (id.).

As the bankruptcy court in Alpha Visions found,

> [The PPP] is intended to meet an unprecedented crisis using whatever tools were ready to hand. The fact that SBA had existing relationships with lenders and their small-business customers throughout the United States provided a structure for distributing congressionally appropriated funds. The fact that notwithstanding the Affordable Care Act's expansion of the availability of health insurance to Americans, many if not most Americans who have health insurance receive it as a benefit of their employment. Thus, maintaining employees' status as employees was important for reasons other than merely providing income replacement. This may have accounted for some of the more unusual provisions of this "loan" program, most importantly, the fact that no underwriting function is anticipated and the fact that the "loan" will be completely forgiven if the applicant simply uses 75% of the loan proceeds to keep its employees employed.

This was the conclusion of Bankruptcy Judge David Jones in Hidalgo County Emergency Service Foundation v. Carranza (In re Hidalgo County Emergency

---

[11] This Court's TRO decisions referenced the TRO in Penobscot Valley Hosp., 20-ap-01005 (Bankr. D. Me. May 1, 2020), doc. # 18, p. 7, for the proposition that "the CARES Act is a grant of financial aid necessitated by a public health crisis." (AP # 20-1003, doc. # 20, p. 6; AP # 20-1004, doc. # 22 p. 7.) As the court in Penobscot has since changed its view on this issue in its proposed findings and conclusions, Penobscot, 20-ap-01005, doc. # 58, p. 18 ("the PPP is a loan program; it is not merely a grant of aid"), the Court does not rely on the Penobscot TRO in its characterization of the CARES Act here.

Service Foundation), Case No. 19-20497; Adv. Pro. No. 20-2006, 2020 WL 2029252 (Bankr. S.D. Tex.) (transcript of oral ruling rendered April 24, 2020), who said:

> And in fact there really isn't an underwriting function…. There's no evaluation of ability to repay, there's no evaluation of collateral…. The entire intent of the program is for people not to pay this back. It's a way of getting money from the government to people who are being harmed. And so long as they use it the right way, they don't have to pay it back.
>
> ***
>
> This isn't a loan program. This is a support program.

Complaint, Ex. 10, transcript of April 24, 2020, TRO hearing, pp. 22–23. This was also the conclusion of Bankruptcy Judge David T. Thuma in <u>Archdiocese of Santa Fe</u>:

> …
>
> As shown above, the PPP is not a loan program. It is a grant or support program. The target grant recipients are small businesses in financial distress. The PPP could only be offered by the government; private lenders do not give away money. PPP funds "are unobtainable from the private sector." <u>Stoltz</u>, 315 F.3d at 90. They also are essential to Plaintiff's fresh start. <u>Id.</u> Of all the benefits a government can grant, free money might be the best of all. Denying Plaintiff access to PPP funds solely because it is a debtor violates § 525(a).

<u>Archdiocese of Santa Fe</u>, 2020 WL 2096113, at *8.

<u>Alpha Visions</u>, 20-ap-00071 (Bankr. W.D. Tenn. June 3, 2020), doc. # 19, pp. 25–26.

While nominally designated as a "loan," the unique features of the PPP, including a lack of any underwriting and a repayment obligation that only arises if the borrower fails to use the funds for purposes underlying the CARES Act, distinguish it from the commercial extension of credit at issue in <u>Goldrich</u>.[12] These same features render the PPP analogous to the public housing lease at issue in <u>Stoltz</u>.

Both subsidized public housing and the PPP are government grant or support programs aimed at helping people in financial distress. Just as "a public housing lease is a grant by which a public housing authority conveys to a public housing tenant the right to use and occupy public housing in exchange for [reduced] rent," <u>Stoltz</u>, 315 F.3d at 90, the PPP is a grant by which the federal government conveys to small businesses impacted by the Covid-19 pandemic the right to use, with no obligation to repay, PPP funds in exchange for using a certain portion of those funds for payroll and wage expenses[13] (UMF ¶ 5).

---

[12] The bankruptcy court in <u>Alpha Visions</u>, 20-ap-00071 (Bankr. W.D. Tenn. June 3, 2020), reaches a similar conclusion regarding <u>Toth</u>. The court observes, "[t]he SBA responds that by its plain language, section 525(a) does not apply to lending or loan guarantees. It claims that the Sixth Circuit directly addressed this issue in Toth[.]" <u>Id.</u> at doc. # 19, p. 23. However, rather than finding <u>Toth</u> applicable, the court rules in favor of the plaintiffs on their § 525(a) claims, finding "the PPP is unlike any other government program previously analyzed under section 525[.]" <u>Id.</u> at p. 25.

[13] While the court in <u>USA Gymnastics</u>, 20-ap-50055 (Bankr. S.D. Ind. June 12, 2020), distinguished <u>Stoltz</u> on the basis that "[t]here, the 'grant' was a public housing lease, not a monetary grant," <u>id.</u> at doc. # 20, p. 15, the Court finds this distinction puts form over substance. A public housing lease confers not just a place to live, but also a significant financial benefit in the

Further, both types of government programs, and the benefits they confer, are unobtainable from the private sector. "Public housing leases are, by definition, obtainable only from governmental entities." Stoltz, 315 F.3d at 90. Similarly, the CARES Act establishes the PPP under § 7(a) of the Small Business Act, codified in 15 U.S.C. § 636, a program administered only by the SBA (UMF ¶ 5). While public housing leases and the PPP are superficially similar to private sector activity – a residential lease and an extension of credit, respectively – they confer unique benefits impossible to obtain from the private sector. Just as private lessors do not offer subsidized or free housing, private lenders do not offer free money.

Finally, both programs are essential to a debtor's fresh start. In Stoltz, the Second Circuit found the debtor-tenant's "entire economic status [therefore] is dependent on" his or her current public housing lease, and "[e]viction-induced homelessness would 'seriously affect the debtors' livelihood [and] fresh start,'" whereas "preventing homelessness promotes the Code's fresh start policy by helping debtors maintain steady employment and self-sufficiency." Stoltz, 315 F.3d at 90. Here, as the Court discusses below, both Plaintiffs would be irreparably harmed absent a permanent injunction allowing them to proceed with their PPP application. The Plaintiffs' income from business operations have declined dramatically, and their exits from chapter 11 have been negatively impacted, due to the Covid-19 pandemic and related federal and state restrictions, and it is unknown when the Plaintiffs will be able to make pre-pandemic levels of services available or when patients will feel safe seeking such services (UMF ¶¶ 19–21, 25, 27). Because of lack of access to PPP funds, the Plaintiffs have had to spend their limited existing cash to pay employees and basic operating expenses, and obtaining the PPP funds would provide additional, needed liquidity to the Plaintiffs and would likely help facilitate their successful reorganization (UMF ¶ 26). Predictable financial sustainability is critical to having a chapter 11 plan confirmed. The PPP funds would "seriously affect" the Plaintiffs' ability to continue business operations and successfully reorganize, and a confirmed and successful plan is essential to the fresh start of these chapter 11 debtors.

Accordingly, based on the undisputed material facts and the Second Circuit's reasoning in Stoltz, the Court finds, as a matter of law, the PPP is an "other similar grant" within the meaning of § 525(a).

### 3.  Other Circuits' Decisions Construing § 525

In addition to Goldrich, the Defendant points to four decisions in other Circuits in support of its argument that § 525(a) does not apply to the PPP, namely Watts, Ayes, Toth, and Exquisito. Although, as set out above, this Court finds Stoltz to be dispositive of the Plaintiffs' § 525(a) claims here, it will

---

form of rent subsidy. "An individual qualifies for public housing because he or she cannot afford housing at prevailing market rates." Stoltz, 315 F.3d at 90.

examine the rationale in those other Circuit decisions since many of the decisions surveyed above relied on them.

In Watts, the plaintiffs applied for loans under the Homeowner's Emergency Mortgage Assistance Program ("HEMAP") and were deemed eligible for monthly assistance by the defendant housing agency. Watts, 876 F.2d at 1091. After the plaintiffs filed for bankruptcy relief, the defendant reevaluated them under HEMAP and terminated their mortgage assistance while the bankruptcy stay was in effect. Id. at 1091–92. The Third Circuit held Congress had limited the scope of § 525(a) to specified types of transactions, and found even if it were inclined to venture beyond the confines of the language of the statute, the suspension of mortgage financing at issue did not undermine the "fresh start" policy of the Bankruptcy Code because assistance could be reinstated once the automatic stay was lifted if the debtor were still at risk of foreclosure. Id. at 1094.

In Ayes, the appellant veterans were denied home loans from private lenders post-bankruptcy because the appellee Veterans Affairs agency refused to extend a full guaranty, as it had suffered losses on previous loan guarantees made on the veterans' behalf that had not been repaid. Ayes, 473 F.3d at 108. The Fourth Circuit held the guaranty entitlement was not an "other similar grant" under § 525(a) because, unlike licenses, permits, charters, and franchises, it did not implicate the government's gatekeeping role in determining who might pursue certain livelihoods. Id. at 109.

By contrast, in Exquisito, the appellee food service provider participated in the SBA's § 8(a) program for socially and economically disadvantaged businesses. Exquisito, 823 F.2d at 152. After the appellee filed for bankruptcy relief, the appellant United States Air Force ("USAF") refused to renew the appellees' contract. Id. The Fifth Circuit compared two approaches in delineating the scope of § 525, one construing § 525 liberally to preclude actions that would frustrate the policy of the Bankruptcy Code of aiding the rehabilitation of the debtor and providing a fresh start, and the other focusing on the specific language of the section, reading the legislative history more narrowly and tending to limit the application of § 525 to situations strictly analogous to those enumerated in the statute. Id. at 153. The court adopted a narrow construction approach to § 525(a) and focused its analysis on two factors, the character of the relationship between the parties and the USAF's reason for refusing to exercise the option, in determining whether the refusal was prohibited by § 525. Id. at 154. The court found that, under the § 8(a) program, the SBA had contracted with the USAF to provide services, then the SBA had determined appellee would have exclusive rights to perform for the length of the contract and the SBA would assist appellee during the life of the contract. Id. The court held the § 8(a) program was essentially a franchise as defined in Black's Law Dictionary and, as such, within the scope of § 525(a), and discriminating against the appellee solely because of filing under chapter 11 was prohibited. Id.

In Toth, the plaintiff applied to the defendant state housing development authority for a home

21

improvement loan through a program administered for the U.S. Department of Housing and Urban Development, several months post-bankruptcy. Toth, 136 F.3d at 478–79. HUD denied her loan application based on the agency's policy of requiring applicants to have at least three years between a bankruptcy case and their application, in order to be eligible. Id. at 479. The Sixth Circuit held the items enumerated in § 525(a) were benefits conferred by government that are unrelated to the extension of credit, and the target of § 525(a) is the government's role as a gatekeeper in determining who may pursue certain livelihoods, and consequently denied the plaintiff's request for § 525 relief. Id. at 480.

Although each of these four decisions cited Goldrich in support of their narrow construction of § 525(a),[14] the majority opinion in Stoltz makes no reference to Watts, Exquisito, or Toth (Ayes was issued after Stoltz). Instead, the Second Circuit repeatedly rejects a narrow construction of that provision. Stoltz, 315 F.3d at 84, 89, 92, n.6. Notably, the dissent in Stoltz does cite Toth, arguing the common thread through the enumerated items in § 525(a) is the "government's role as a gatekeeper in determining who may pursue certain livelihoods." Stoltz, 315 F.3d at 95 (dissenting opinion, citing Toth, 136 F.3d at 480); see also Ayes, 473 F.3d at 109 (quoting Toth). The majority in Stoltz chose not to follow this limited view of § 525(a) shared by the dissent and the courts in Toth and Ayes, given that a public housing lease, which the Second Circuit determined in Stoltz to be within the purview of § 525(a), is unrelated to the government's role in gatekeeping the pursuit of livelihood.

## B. A Permanent Injunction is Warranted

Having determined that the Defendant's conduct – namely, excluding the Plaintiffs from participation in the PPP program solely because of their status as bankruptcy debtors – constitutes discrimination in violation of § 525(a) of the Bankruptcy Code, the Court turns next to the formulation of a remedy for the Plaintiffs and the question of whether a permanent injunction is warranted.

The Plaintiffs have requested a four-part permanent injunction that

(i)     requires the SBA to allow the Plaintiffs to participate fully in all aspects of the PPP, if otherwise eligible, once the Debtor's bankruptcy status is disregarded, including submission of a PPP application, review of the application by a participating financial institution, participation in forgiveness and review of an application for forgiveness, and provision of a 100% SBA guaranty;

(ii)    established the date the Plaintiffs' applications were approved, pursuant to this Court's Second TRO, as the date the Plaintiffs received the PPP funds and the start of the "covered period" as defined by §§ 1102 and 1106 of the CARES Act, even if the Plaintiffs actually received the PPP funds at a later date;

(iii)   provides that the Plaintiffs shall submit their PPP forgiveness applications at the end of the "covered period", and SBA shall process and review the Plaintiffs'

---

[14] The courts in Watts and Ayes objected to characterizing their construction of § 525(a) as narrow. "As Watts noted, because § 525(a) is unambiguous, our interpretation is not 'narrow,' but instead succinctly correct." Ayes, 473 F.3d at 111, citing Watts, 876 F.2d at 1093–94. However, this Court is mirroring the language the Second Circuit itself uses to describe Goldrich. See Stoltz, 315 F.3d at 86, n. 2 ("Goldrich … in which this Court had **narrowly construed** section 525(a)'s 'other similar grant' language") (emphasis added.)

forgiveness applications as required by the CARES Act and the SBA's rules and guidance without regard to the Plaintiffs' bankruptcy status; and

    (iv)    provides that the Plaintiffs' bankruptcy status shall not be grounds for the SBA to refuse to honor the forgiveness payment or guaranty obligations to a participating financial institution that disbursed funds to them, under the PPP program.

(AP # 20-1003, doc. # 48, ¶¶ 2–3; AP # 20-1004, doc. # 45, ¶¶ 2–3).

Mascoma has not taken a position on the merits of the action, but has filed a memorandum of law asking that any permanent injunction this Court grants include the following provisos, in order to protect it from financial risk or loss:

    (1)    the Plaintiffs did not lose their qualification as "eligible recipients" as defined in the CARES Act as a result of these bankruptcy cases or by filing PPP loan applications that did not disclose their involvement in bankruptcy;

    (2)    any actions Mascoma took in accordance with the orders of this Court, including without limitation its submission of loan applications to the SBA that did not disclose that the Plaintiffs had filed bankruptcy cases, or any extension or delay in meeting any time requirements for disbursing the PPP loan funds, shall:

        (a)    have no adverse effect on Mascoma's eligibility for the SBA guaranty, payment of lender processing fees, and remittance of amounts of loan forgiveness by Mascoma, and

        (b)    not be treated as a breach or violation of Mascoma's obligations under section III.3.b of the First Interim Final Rule and the document collection and retention requirements described in the lender application form (SBA Form 2484); and

    (3)    any deadlines or other requirements for disbursing the PPP funds, for granting loan forgiveness, or applying for remittances under 15 U.S.C. § 9005 are stayed until entry of a final judgment, with these provisions, is not subject to further appeal.

(AP # 20-1003, doc. # 54, p. 7; AP # 20-1004, doc. # 52, p. 7).

The Defendant opposes entry of any injunction, relying primarily on three arguments: (1) the Plaintiffs are barred from obtaining an injunction based on her and the SBA's sovereign immunity, pursuant to 15 U.S.C. § 634(b)(1); (2) the Plaintiffs have failed to demonstrate the required elements authorizing a permanent injunction; and (3) the scope of the injunction sought is overbroad and contrary to law (AP # 20-1003, doc. # 56, pp. 3–4; AP # 20-1004, doc. # 54, pp. 3–4).

The Court must determine, as a matter of law, whether the plaintiffs are entitled to a permanent injunction and, if so, the scope of that relief. It begins with an analysis of the Defendant's most fundamental argument in opposition to injunctive relief.

### 1.  *Sovereign Immunity Does Not Bar Injunctive Relief Here*

In its TRO decisions, the Court previously examined the question of whether the Defendant is protected by sovereign immunity from the Plaintiffs' requests for injunctive relief, and held (i) it has statutory authority under 11 U.S.C. §§ 105, 106, and 525 to enter carefully tailored injunctive relief against the Defendant; (ii) it has constitutional authority to enter a final judgment; and (iii) it is not barred

from granting injunctive relief by 15 U.S.C. § 634(b)(1) (AP # 20-1003, doc. # 20, p. 5; AP # 20-1004,

doc. # 22, p. 5).

In her memorandum of law filed in connection with this summary judgment proceeding, the

Defendant again asserts injunctive relief is barred under 15 U.S.C. § 634(b)(1),[15] but presents no new

arguments that persuade this Court there is any reason to disturb its earlier determination that §§ 105, 106,

and 525 abrogate the Defendant's sovereign immunity. As this Court previously concluded, these

sections, taken together, authorize the Court to enjoin the Defendant from taking any action this Court

finds to be a violation of § 525(a). Moreover, notwithstanding the Defendant's arguments to the contrary,

this Court finds the rationale of the First Circuit in Ulstein Maritime, Ltd. v. United States, 833 F.2d 1052

(1st Cir. 1987), to be persuasive. That court opined as follows:

> The bare language facially [of § 634(b)(1)] suggests that "no . . . injunction" can be
> directed at the SBA. Some courts have read the wording in this way, and concluded
> that all injunctive relief directed at the SBA is absolutely prohibited. However, other
> courts have found that § 634(b)(1) does not bar injunctions in all circumstances.

> The meaning of the limitation on the waiver of immunity in § 634(b)(1) was
> analyzed in Cavalier Clothes, 810 F.2d at 1108. There the court reviewed and
> endorsed the careful analysis of the legislative history of § 634(b)(1) in Related
> Industries, 2 Cl.Ct. at 522–23. The origin and purpose of the language in § 634(b)(1)
> goes back to the decision in FHA v. Burr, 309 U.S. 242, 84 L. Ed. 724, 60 S. Ct. 488
> (1940), which held that when Congress established an agency that was authorized to
> engage in business transactions and permitted it to "sue and be sued" (as is true of
> the SBA), this waiver extended to all civil processes incident to suit such as
> garnishment and attachment of the agency's assets. Therefore, language such as that
> in § 634(b)(1) was added to enabling statutes to bar the attachment of agency funds
> and other interference with agency functioning. The same boilerplate language is
> found repeatedly in statutes establishing agencies that provide loans or funds to the
> public, e.g., 7 U.S.C. § 1506(d) (Federal Crop Insurance Corporation); 15 U.S.C. §
> 714b(c) (Commodity Credit Corporation); 42 U.S.C. § 3211(11) (Secretary of
> Commerce). While the specific legislative history of § 634(b)(1) is silent on the
> purpose of this language, the legislative history of earlier statutes containing the
> identical wording indicates that it was intended to keep creditors or others suing the
> government from hindering and obstructing agency operations through mechanisms
> such as attachment of funds. "Nothing in the language or the legislative history of §
> 634 suggests that Congress intended to grant the SBA any greater immunity from
> injunctive relief than that possessed by other governmental agencies." "Rather, it
> merely intended to insure [sic] that the SBA be treated the same as any other
> government agency in this respect." **The no-injunction language protects the
> agency from interference with its internal workings by judicial orders attaching**

---

[15] 15 U.S.C. § 634(b)(1) provides [with the Defendant's emphasis added]:

> the SBA may sue and be sued in any court of record of a State having general jurisdiction, or in any United
> States district court, and jurisdiction is conferred upon such district court to determine such controversies
> without regard to the amount in controversy; **but no attachment, injunction, garnishment, or other
> similar process, mesne or final, shall be issued against the [agency] or [its] property[.]**

(AP # 20-1003, doc. # 56, p. 17; AP # 20-1004, doc. # 54, p. 17).

**agency funds, etc., but does not provide blanket immunity from every type of injunction. In particular, it should not be interpreted as a bar to judicial review of agency actions that exceed agency authority where the remedies would not interfere with internal agency operations.**

Ulstein, 833 F.2d at 1056–57 (internal citations omitted) (emphasis added).

Subsequent to this Court's issuance of the TROs here, its sister court in Tennessee reached the same conclusion in Alpha Visions, 20-ap-00071 (Bankr. W.D. Tenn. June 3, 2020), with respect to sovereign immunity and acknowledged the importance and applicability of the Ulstein decision in PPP causes of action. Id. at doc. # 19, pp. 6–9. In weighing the merits of the arguments before it, that court also sought to deduce how the Sixth Circuit would likely view the sovereign immunity questions raised in PPP litigation. To do this, the bankruptcy court examined the recent ruling in DV Diamond Club of Flint, LLC, 2020 WL 2315880, *7 (E.D. Mich. May 11, 2020), in which the district court granted a preliminary injunction against the SBA based on its denial of a certain entity's PPP eligibility, and the Sixth Circuit's denial of a stay pending appeal of that ruling, DV Diamond Club of Flint, LLC, No. 20-1437 (6th Cir. May 16, 2020). Those decisions persuaded the Alpha Visions court it had a solid jurisprudential basis for finding sovereign immunity did not preclude it from entering a permanent injunction against the SBA based on the SBA's violation of the APA and § 525. In reaching that conclusion, the bankruptcy court observed that Ulstein provided part of the foundation for the district court's ruling.

> This court is convinced that the refusal of the court of appeals to disturb the injunction issued by the district court in DV Diamond Club is the best indication of how the court of appeals will rule on the merits [of the plaintiff's claim]. Relying on Camelot Banquet Rooms, which in turn relied upon Ulstein Maritime, Ltd. v. United States, 833 F.2d 1052, 1056–57 (1st Cir. 1987), the district court held that section 634(b)(1) does not preclude SBA from being enjoined to set aside unlawful agency action. Here, as there, all that SBA will be enjoined to do is to direct the Plaintiff's chosen lender to process its loan application and to guarantee any PPP loan to which Alpha is otherwise entitled. This court is persuaded that injunctive relief is available to Alpha in the context of this adversary proceeding.

Alpha Visions, 20-ap-00071 (Bankr. W.D. Tenn. June 3, 2020), doc. # 19, p. 8. This Court reaffirms its reliance on Ulstein and the applicability and significance of that case in analyzing the SBA's sovereign immunity defense in these PPP proceedings.

It is also significant that Congress enacted § 106 of the Bankruptcy Code in 1978, 20 years after it enacted § 634 of the Small Business Act in 1958 (and 25 years after prior similar provisions of that Act were originally enacted in 1953). The Court finds this sequence of events to support construing § 106(a) as an expression of Congress' intent to abrogate sovereign immunity with respect to Bankruptcy Code §§ 105, 106, and 525. Congress has not authorized the Defendant to take actions that violate Bankruptcy Code § 525(a), and the undisputed material facts do not show the injunction the Plaintiff seeks would interfere with the SBA's internal agency operations.

Accordingly, this Court concludes it is not barred from entering a carefully crafted injunction against the SBA by principles of sovereign immunity or 15 U.S.C. § 634(b)(1).

### 2.  *Plaintiffs Meet the Legal Standard to Obtain a Permanent Injunction*

Having found there are no material facts in dispute, and sovereign immunity of the Defendant does not bar the granting of this relief, the Court turns to the question of whether the Plaintiffs are entitled to an injunction, as a matter of law. The legal standard for a permanent injunction is clear: the Plaintiffs must demonstrate (a) they have suffered an irreparable injury, (b) the remedies available at law, such as monetary damages, are inadequate to compensate for that injury, (c) considering the balance of hardships between the Plaintiffs and the Defendant, a remedy in equity is warranted, and (d) the public interest would not be disserved by a permanent injunction. Entergy Nuclear Vt. Yankee, LLC v. Shumlin, 733 F.3d 393, 422–23 (2d Cir. 2013) (quoting Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139 (2010)).

"The decision to grant or deny permanent injunctive relief is an act of equitable discretion …" eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006). "In fashioning the injunction, the Court should balanc[e] ... the equities to reach an **appropriate** result protective of the interests of both parties." Patsy's Italian Rest., Inc. v. Banas, 658 F.3d 254, 272 (2d Cir. 2011) (emphasis in original) (quoting Sterling Drug, Inc. v. Bayer AG, 14 F.3d 733, 747 (2d Cir. 1994)). Additionally, the Second Circuit has instructed that the court's duty in formulating the scope and contours of a permanent injunction is to ensure that it is appropriate for the circumstances, and type of business, before it:

> A district court has a "wide range of discretion in framing an injunction in terms it deems reasonable to prevent wrongful conduct." Given the district court's great flexibility in fashioning relief, we have frequently recognized that the use of a disclaimer sign can, in the right circumstances, be appropriate relief. Whether [the relief sought in the instant injunction] is appropriate "depends on the circumstances of the relevant business and its consumers."

Banas, 658 F.3d at 273–74 (internal citations omitted). Here, the Court must consider what is appropriate for entities that are on the front line of Covid-19 care, during a national pandemic caused by that disease.

In their memoranda of law, the Plaintiffs and the Defendant address the legal standard for a permanent injunction in the context of SH and SMCS' circumstances, with the Plaintiffs asserting they have established all four prongs necessary to meet this standard and the Defendant contending the Plaintiffs have failed to satisfy any of them.

### a.  Irreparable Injury

The first prong of the test, irreparable injury, can encompass intangible harm as well as economic harm.

> Irreparable harm is "harm for which there is no adequate legal remedy, such as an award for damages." For this reason, economic harm is not generally considered irreparable. But where parties cannot typically recover monetary damages flowing from their injury—as is often the case in APA cases—economic harm can be

26

considered irreparable. **Intangible injuries may also qualify as irreparable harm, because such injuries "generally lack an adequate legal remedy."**

E. Bay Sanctuary Covenant v. Trump, 950 F.3d 1242, 1280 (9th Cir. 2020) (internal citations omitted and emphasis added). Courts may also find irreparable harm where the "evidence suggest[s] that it is impossible to precisely calculate the amount of damage plaintiff will suffer," Southwest Stainless, LP v. Sappington, 582 F.3d 1176, 1191 (10th Cir. 2009) (citing Equifax Servs., Inc. v. Hitz, 905 F.2d 1355, 1361 (10th Cir. 1990)).

In the instant proceedings, there are too many unknowns to precisely quantify the damages the Plaintiffs are likely to suffer based on the Defendant's discrimination. The following material facts are undisputed and address that point:

(i)      The Plaintiffs' income from business operations have declined dramatically, and their exits from chapter 11 have been negatively impacted, due to the Covid-19 pandemic and related federal and state restrictions (UMF ¶¶ 19–21).

(ii)     It is unknown if or when the Plaintiffs will be able to make available pre-Covid-19 levels of services or, once that date arrives, when patients will feel safe seeking such services (UMF ¶¶ 21, 25, 27).

(iii)    The first tranche of first come, first served PPP funds has already been exhausted, and it is unknown whether there will be any funds under the PPP program available at the time litigation of the instant issues concludes, or whether future funds will be made available under the PPP program, once the current tranche of PPP funds are exhausted (UMF ¶¶ 5, 13, 22).

At this juncture, it is not possible to predict what resolutions or circumstances will flow from these uncertainties. Hence, it is not possible to calculate the amount of the damages the Plaintiffs will ultimately suffer. However, the Plaintiffs have established it is likely they will suffer a real and substantial loss if deprived access to PPP funds. This will manifest both as the loss of opportunity to obtain funds that will most likely turn out to be forgivable, which other non-debtor entities are able to obtain, as well as the loss of cash to pay employees and basic operating expenses (see UMF ¶ 26). Denial of access to the PPP not only denies the Plaintiffs a significant amount of money in the near-term, but also jeopardizes their ability to reorganize, exit chapter 11, and continue operating in the future, causing immeasurable harm to the Plaintiffs, their employees, and the community if these Plaintiffs – two of the largest employers in the area and providers of essential medical services – are forced to shut down (UMF ¶¶ 1–2, 16, 26). The Plaintiffs readily acknowledge they cannot pinpoint an exact date they will run out of money and disclose that they have received other emergency funding, but repeatedly return to the reality we must all confront today, which is that no one knows if or when there will be a vaccine available or, conversely, a second wave of Covid-19 cases (UMF ¶¶ 20–25).

The Defendant argues the Plaintiffs have only shown that they would benefit from PPP funds, and that showing is insufficient to demonstrate the requisite irreparable harm. She points in particular to their receipt of significant federal stimulus funds, and their acknowledgement that those funds have staved off

the immediate risk of closure and are not the sole determining factor of a successful exit from chapter 11.

The Defendant also points to the Plaintiffs' inability to project an exact amount of damages or state with certainty how much other stimulus money might become available to them or identify the date when their business operations will normalize, in support of her claim that the Plaintiffs have failed to show irreparable harm (AP # 20-1003, doc. # 56, p. 22; AP # 20-1004, doc. # 54, p. 22).

From the Court's perspective, the declarations of the Plaintiffs' interim/acting CEOs are thoughtful, candid, and reflective of the uncertainty surrounding the coronavirus and its impact, and the inability of anyone to prognosticate how this global pandemic will play out in this country, generally, or with respect to the Plaintiffs' operations, in particular.

The fatal flaw in the Defendant's position that no injunction should be granted until it is clear the Plaintiffs "will be unable to weather the storm," id. at p. 23, is that position cannot be reconciled with the uncertainty and unpredictability of the Covid-19 pandemic and its impact, which seems likely to be significant for at least the next 12–18 months or until there is widespread treatment and a vaccine (see UMF ¶ 27). By the time the Plaintiffs are in a position to make those determinations definitively, the current tranche of PPP funds will likely be long gone, with no guarantee additional PPP funds will be available. This issue of inherent uncertainty is analogous to the difficulty other courts have faced in trying to discern and predict the damage that competition might cause. As Judge Hand opined, nearly 70 years ago, irreparable injury has always included the kind of injury that is impossible to predict:

> The plaintiff indeed has failed to show any "irreparable injury," if by that is meant that money will not satisfy any loss that the defendant's competition will cause; nevertheless **it has shown such an [irreparable] injury, if that includes the impossibility of ascertaining with any accuracy the extent of the loss. That has always been included in its meaning**; and I cannot see how the plaintiff will ever be able to prove what sales the defendant's competition will make it lose, to say nothing of the indirect, though at times far-reaching, effects upon its good will as the only licensee of the British company.

Foundry Servs. v. Beneflux Corp., 206 F.2d 214, 216 (2d Cir. 1953) (Hand, J., concurring) (emphasis added); see also Basicomputer Corp. v. Scott, 973 F.2d 507, 511 (6th Cir. 1992) (holding an injury is irreparable "if the nature of the plaintiff's loss would make damages difficult to calculate"); Berni v. Barilla G. e R. Fratelli, S.p.A., 332 F.R.D. 14, 26 (E.D.N.Y. 2019) ("The Second Circuit has held on multiple occasions that injunctive relief is appropriate where damages are not adequately ascertainable.") (citations omitted).

Based on the undisputed facts here, the Court concludes the Plaintiffs are now suffering harm – and will continue to suffer harm – as a result of the Defendant's discrimination. This finding is further supported by the record in the underlying bankruptcy cases, including the financial reports, case management conference orders, and sworn declarations attached to the parties' statements of fact, without

any objection (see AP # 20-1003, doc. # 36 (attaching copies of ch 11 # 19-10283, doc. ## 5, 336, 348),

doc. # 41; AP # 20-1004, doc. # 32 (attaching copies of ch 11 # 19-10285, doc. ## 11, 340, 357), doc. #

39; see also AP # 20-1003, doc. # 32 (attaching copies of ch 11 # 19-10283, doc. ## 337, 365, 384 and ch

11 # 19-10285, doc. ## 343, 357, 361, 379), doc. # 40; AP # 20-1004, doc. ## 30, 38). The difficulty (if

not impossibility) of quantifying that harm – particularly in the context of a global pandemic without a

vaccine – supports, rather than undercuts, the Plaintiff's establishment of the irreparable injury prong.

b.   <u>No Adequate Remedy at Law</u>

The salient question with respect to this prong is whether money damages would be adequate to

compensate the Plaintiffs for the discrimination they have suffered as a result of the SBA's determination

that they are not eligible to participate in the PPP program solely because they are under the protection of

the Bankruptcy Code. As discussed above, where is it is not objectively and reasonably possible to

compute the amount of damages necessary to provide an appropriate remedy, there is no adequate remedy

at law. See <u>Foundry Servs. v. Beneflux Corp.</u>, 206 F.2d at 216; <u>see also</u> <u>Dresser-Rand Co. v. Virtual</u>

<u>Automation Inc.</u>, 361 F.3d 831, 848 (5th Cir. 2004) (holding "[F]or purposes of injunctive relief, an

adequate remedy at law exists when the situation sought to be enjoined is capable of being remedied by

legally measurable damages") (citation omitted).

Indeed, as the District Court for the District of Vermont (Crawford, C. J.) observed just last year,

in the exercise of their "interstitial" equitable powers, courts may, and should, impose injunctive relief

where a sum of money is insufficient to remedy the injury before them:

> Injunctive relief may be available in cases in which money damages cannot address
> the loss. <u>Appeal of Gadhue</u>, 149 Vt. 322, 326, 544 A.2d 1151, 1153 (1987) ("Thus,
> plaintiff's ability to request a mandatory injunction was in no way impaired by the
> absence of special damages.").

> The equitable powers of our courts are available to address important public policy
> concerns, especially those which have not been resolved through statutory or
> common-law damages remedies. The equitable authority is interstitial. It fills gaps
> and repairs unfairness in particular cases.

<u>Sullivan v. Saint-Gobain Performance Plastics Corp.</u>, 431 F. Supp. 3d 448, 456–57, 2019 U.S. Dist.

LEXIS 221612 (D. Vt. 2019).

Based on the undisputed material facts and the equitable exigencies presented in this proceeding,

the Court finds there is no adequate remedy at law and the Plaintiffs, therefore, prevail on this prong of

the test.

c.   <u>The Balance of Hardships</u>

The Defendant rests on her previous briefing to demonstrate that the balance of hardships weighs

in her favor (AP # 20-1003, doc. # 56, p. 23; AP # 20-1004, doc. # 54, p. 23). The Court found above the

Plaintiffs would suffer irreparable harm absent a permanent injunction and that they have no adequate

29

remedy at law. The Defendant's primary argument on this issue has been that injunctive relief could disrupt administration of the PPP. In its TRO decisions, the Court found to be without merit (AP # 20-1003, doc. # 20, p. 9; AP # 20-1004, doc. # 22, pp. 9–10). In the absence of any new argument by the Defendant, and for the same reasons as set forth in its previous decisions, the Court finds the balance of hardships weighs definitively in favor of granting the permanent injunction.

### d.  The Public Interest

The Defendant also rests on her previous briefing with respect to the how public interest affects, and would be affected by, the outcome of this dispute (AP # 20-1003, doc. # 56, p. 23; AP # 20-1004, doc. # 54, p. 23). In its TRO decisions, the Court found the Plaintiffs' businesses, both as "front line" health care providers and as two of the largest private sector employers in the area, are vital to the public, especially in the midst of the Covid-19 pandemic, and the scope of injunctive relief sought was sufficiently narrow to allay the public interest concerns articulated by the Defendant (AP # 20-1003, doc. # 20, pp. 9–10; AP # 20-1004, doc. # 22, pp. 10–11). There have been no new arguments or facts asserted that persuade the Court to reach a different conclusion here. Accordingly, for the same reasons set forth in its previous decisions, the Court finds the public interest is best served by granting the permanent injunction.

### e.  Impediment to the Reorganization Process

Additionally, the Second Circuit – and the bankruptcy courts within this Circuit – have held that bankruptcy courts have the authority to issue injunctions under § 105 when necessary to enjoin conduct that "might impede the reorganization process," and may do so even if the plaintiff has not established the four usual required elements for an injunction described above. In reviewing the bankruptcy court's authority to issue such an injunction, the Second Circuit emphasized the equitable power of the bankruptcy court, under § 105, to grant such extraordinary relief:

> The permanent injunction entered by the bankruptcy court also is supported by its equitable powers pursuant to § 105(a). That provision grants the bankruptcy court power to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a) (1988). "This provision has been **construed liberally to enjoin [actions] that might impede the reorganization process.**" MacArthur Co. v. Johns–Manville Corp. (In re Johns–Manville Corp.), 837 F.2d 89, 93 (2d Cir.), cert. denied, 488 U.S. 868 (1988).

In re Prudential Lines Inc., 928 F.2d 565, 574 (2d Cir. 1991) (emphasis added and modification in original). Prudential Lines reads as an endorsement of the ruling three years earlier in LTV Steel Co. v. Bd. of Ed. (In re Chateaugay Corp. Reomar, Inc.), 93 B.R. 26 (S.D.N.Y. 1988), where the district court held, "[t]he usual grounds for injunctive relief such as irreparable injury need not be shown in a proceeding for an injunction under section 105(a)." Chateaugay, 93 B.R. at 29. Bankruptcy courts have subsequently relied on those decisions to enter injunctions without requiring plaintiffs to demonstrate the

four prongs of the injunction test, including the irreparable harm prong. See Adelphia Communs. Corp. v. America Channel, LLC (In re Adelphia Communs. Corp.), 345 BR 69, 85 (Bankr. S.D.N.Y. 2006) ("the Court notes that it has been repeatedly held in this district that the usual grounds for injunctive relief, such as irreparable injury, need not be shown in a proceeding for an injunction under section 105(a)").

This is consistent with the perspective of the leading bankruptcy treatise, which describes the bankruptcy court's equitable powers under § 105 by reference to a seminal U.S. Supreme Court decision, Celotex Corp. v. Edwards, 514 U.S. 300 (1995):

> The [Celotex] Court took an expansive view of "related to" jurisdiction, even wondering at one point that "[t]he jurisdiction of bankruptcy courts may extend more broadly" in chapter 11 cases than in chapter 7 cases. **This gives some credence to the argument that section 105 orders need to be assessed against the background of the provisions *and* purposes of title 11.**
>
> In some respects, Celotex follows the Court's lead in Energy Resources [495 U.S. 545 (1990)]. Energy Resources confirmed the equitable nature of the bankruptcy power. The equitable origins of the bankruptcy power suggest substantial leeway to tailor solutions to meet the diverse problems facing bankruptcy courts. Section 105 gives the bankruptcy court the power to fill in gaps and further the statutory mandates of Congress in an efficient manner.

COLLIER ON BANKRUPTCY ¶ 105.01 (Richard Levin & Henry J. Sommer eds., 16th ed.) (emphasis added).

While this Court found above that the Plaintiffs have established the four elements traditionally required for the issuance of an injunction, it finds further authority under § 105 to grant the injunction. The Covid-19 pandemic has negatively impacted the Plaintiffs' exit from chapter 11, as they have each experienced an unforeseen, drastic and material drop in cash receipts (UMF ¶¶ 19, 21). Due to the lack of PPP funds available to them, the Plaintiffs have had to spend their limited cash on payroll and other immediate business operation needs; PPP funds would provide needed liquidity and likely help facilitate their successful reorganizations and exits from chapter 11 (UMF ¶ 26).

Based on these undisputed facts, and acknowledging the impossibility of predicting the precise impact of the coronavirus and the restrictions imposed in response to it,  the Court finds that denying the Plaintiffs' access to the PPP funds might, and most likely will impede their reorganization process. This finding is further supported by the undisputed record in these underlying bankruptcy cases, including financial reports, case management conference orders, and sworn declarations attached to the parties' statements of fact (see above). Based on Prudential Lines, and the jurisprudence regarding the criteria for injunctive relief under § 105 within this Circuit, this record constitutes a sufficient basis for granting the Plaintiffs' request for a permanent injunction under § 105.

### 3.   *Plaintiffs' Requested Injunctive Relief is Not Overly Broad or Contrary to Law*

The Defendant argues that the scope of the injunction the Plaintiffs seek is overly broad and contrary to law. She does not, however, explicate a rational basis for that position. The Plaintiffs are not

seeking a national injunction or an injunction on behalf of anyone other than themselves. Contrary to the Defendant's interpretation of the Plaintiffs' request for injunctive relief – see AP # 20-1003, doc. # 56, p. 24; AP # 20-1004, doc. # 54, p. 24 – the Plaintiffs are not asking this Court to direct any lender to make the loan or the SBA to guaranty or forgive this loan ("at the front end of the loan application process" or at any time), nor are they asking this Court for any special treatment other than the same access to the PPP funds that all other similarly situated businesses would have if not in bankruptcy. The Defendant asserts the "Plaintiffs are seeking to dramatically alter the status quo and favor these Plaintiffs over every other recipient of a PPP loan." Id. at p. 26. The Court finds this argument to be wholly unfounded; the Plaintiffs are instead seeking equal footing with other applicants.

The only rather unconventional term the Plaintiffs seek in the injunction is a directive that, for purposes of the CARES Act and the PPP program, the funds shall be "deemed disbursed" as of the date their loan applications were approved. In light of the complexities and continually evolving nature of the CARES Act legislation and its progeny, and the unpredictability of the Defendant's interim and final rules, this seems a prudent safeguard to include for both the Plaintiffs and their putative lender. The Court does not find the terms the Plaintiffs have requested, even with this one unconventional contour, to be overly broad or contrary to law.

In sum, the Court finds the Defendant's three objections are unavailing. First, neither principles of sovereign immunity nor any statute protects the Defendant from entry of an injunction against her based on her discrimination against the Plaintiffs and violation of § 525(a) of the Bankruptcy Code. Second, the undisputed material facts demonstrate the Plaintiffs have established the criteria for entry of an injunction under both the generally accepted four-part test and the lower threshold test authorized by case law construing the authority of bankruptcy courts to enter injunctions pursuant to § 105. Finally, the SBA's argument that the injunction is overly broad and contrary to law fails because the Court is granting a narrowly tailored injunction, which is only as expansive in scope as is necessary to ensure that the Plaintiffs have the same access to PPP funds, and PPP loan forgiveness, as they would have if they were not in a bankruptcy case.

### 4.  *Mascoma's Request for Certain Terms in Injunction*

Mascoma's memorandum of law focuses on the terms to be included in any judgment or injunction this Court enters in this matter, and how those terms intersect – or potentially conflict – with the CARES Act provisions for protection of lenders (AP # 20-1003, doc. # 54; AP # 20-1004, doc. # 52). In particular, Mascoma raises concerns about whether the SBA will honor its guaranty to Mascoma if this Court grants all of the relief the Plaintiffs have requested. Mascoma is a crucial party in interest based on its role as the recipient of the Plaintiffs' PPP applications and the Plaintiffs' putative PPP lender. Mascoma points out that it is a preferred lender under SBA's 7(a) loan program, see 15 U.S.C. § 636(a)

and, though it is not required to make PPP loans, it has chosen to do so as part of its commitment to small

businesses and nonprofit entities in Vermont and New Hampshire (AP # 20-1003, doc. # 54, pp. 2–3; AP

# 20-1004, doc. # 52, pp. 2–3). The following points are essential to Mascoma's position: (i) it, as the

lender (rather than the SBA), extends the funds advanced under the PPP program; (ii) the PPP program

includes a 100% guarantee by the SBA (a higher rate than other SBA guarantee programs), <u>compare</u> 15

U.S.C. §9005(c)(2) and 15 U.S.C. § 636(a)2)(F); and (iii) recent rules suggest the SBA may not honor its

guarantee of any PPP loan a lender makes to a bankruptcy debtor. <u>Id.</u> at p. 3.

      Mascoma indicates the Final Interim Rules published on April 15, 2020, at 15 Fed. Reg. 20811

gave it some comfort, as it included this reassuring guidance in a question-and-answer format:

> 4. What do both borrowers and lenders need to know and do?
>
>   a.  What are the loan terms and conditions?
>
> Loans will be guaranteed under the PPP under the same terms, conditions and processes as other 7(a) loans, with certain changes including but not limited to:
>
>     i.  The guarantee percentage is 100 percent.
>
>     ii.  No collateral will be required.
>
>     iii.  No personal guarantees will be required.
>
>     iv.  The interest rate will be 100 basis points or one percent.
>
>     v.  All loans will be processed by all lenders under delegated authority and lenders will be permitted to rely on certifications of the borrower in order to determine eligibility of the borrower and the use of loan proceeds.

(AP # 20-1003, doc. # 54, pp. 3–4; AP # 20-1004, doc. # 52, pp. 3–4).  Mascoma also points out that the

SBA repeated that assurance in the interim rule published on June 1, 2020, at 85 Fed. Reg. 33010, § III 3.

a and b. However, Mascoma calls the Court's attention to SBA's introduction of uncertainty regarding its

guaranty in the last line of section III 3 c (with Mascoma's emphasis):

> b. Are lender processing fees subject to clawback if SBA determines that a borrower is ineligible?
>
> Yes. For any SBA-reviewed PPP loan, if within one year after the loan was disbursed SBA determines that a borrower was ineligible for a PPP loan based on the provisions of the CARES Act or applicable rules or guidance available at the time of the borrower's loan application, or the terms of the loan application, SBA will seek repayment of the lender processing fee from the lender. However, SBA's determination of borrower eligibility will have no effect on SBA's guaranty of the loan if the lender has complied with its obligations under section III.3.b of the First Interim Final Rule and the document collection and retention requirements described in the lender application form (SBA Form 2484).
>
> c.    Are lender processing fees subject to clawback if a lender has not fulfilled its obligations under PPP regulations?
>
> Yes. If a lender fails to satisfy the requirements applicable to lenders that are set forth in section III.3.b of the First Interim Final Rule or the document collection and

retention requirements described in the lender application form (SBA Form 2484),
SBA will seek repayment of the lender processing fee from the lender and **may
determine that the loan is not eligible for a guaranty**.

(AP # 20-1003, doc. # 54, pp. 4–5; AP # 20-1004, doc. # 52, pp. 4–5).

If enforced, this aspect of the rule would allow the SBA to refuse to guarantee the Plaintiffs' loans, based solely on their status as bankruptcy debtors, even if the SBA determined the Plaintiffs were entitled to forgiveness and were not required to repay the PPP advance to Mascoma. Most problematic perhaps is, as Mascoma frames it,

> SBA continues to issue new notices and interim rules, as recently as June 1, and many aspects of the program, including the mechanics applying for loan forgiveness and remittance to the lender, have yet to be detailed … That uncertainty, especially as to the SBA's guaranty, places the risk of nonpayment squarely on Mascoma or any other lender advancing funds to these [Plaintiffs], which is not present in any other PPP loan advanced to non-debtor entities.

Id. at pp. 5–6.

Based on those very legitimate concerns and the fluid and evolving nature of the SBA's rules, the Court finds it is appropriate to fine-tune the injunction even more than the Plaintiffs have requested, to ensure that the injunction neither places Mascoma at great risk of losing its guaranty nor discourages Mascoma from advancing funds to the Plaintiffs under the PPP program based on that perceived risk.[16]

In its TROs, this Court authorized the Plaintiffs to file PPP applications without checking the box indicating they were debtors, and directed the SBA and its authorized lenders to process the Plaintiffs' applications as if they were not debtors. In this way, the discriminatory eligibility factor was taken out of the analysis. However, the Court finds the current rules, including the Forgiveness Rule (see UMF ¶ 18), require an affirmative finding that the Plaintiffs are "eligible recipients," as defined in the CARES Act, to protect Mascoma, as the PPP lender, from being denied a guaranty to which it would otherwise be entitled if these Plaintiffs were not being discriminated against based on their status as bankruptcy debtors.

Mascoma also asks that the Court make clear in the injunction that the SBA may not deny a guaranty, payment of lender processing fees, or loan forgiveness to Mascoma, based on any action Mascoma takes to comply with this Court's orders. (AP # 20-1003, doc. # 54, p. 7; AP # 20-1004, doc. # 52, p. 7.) This Court specifically asked the Defendant if she might deny benefits to Mascoma for actions it took pursuant to Court orders, at the oral arguments held on June 10, 2020, and the Defendant did not give a clear or direct response despite the Court's repeated attempts to get an answer to that question. Thus, the Court concludes this provision is also necessary to protect Mascoma and avoid potential disputes and litigation over this question.

---

[16] At the oral arguments held on June 10, 2020, Mascoma indicated it could not risk advancing a loan of this size to the Plaintiffs while the risk of losing its guaranty remained.

Finally, Mascoma asks that the Court stay the deadlines and other requirements for disbursing the PPP funds, and for granting loan forgiveness or applying for remittance under 15 U.S.C. §9005, until a final judgment on this issue is entered and no longer subject to appeal (AP # 20-1003, doc. # 54, p. 7; AP # 20-1004, doc. # 52, p. 7). This is the caveat that presents the most controversy and logistical challenge. The Defendant opposes inclusion of this term because, as she argued at the oral arguments, it would effectively eliminate her appeal rights. This is a valid point. If the Court directs Mascoma to disburse PPP funds to the Plaintiffs immediately (so the Plaintiffs can disburse them within the required time frame), and directs the Defendant to ensure the SBA honors its guaranty to Mascoma as long as Mascoma complies with all rules other than those directed at the Plaintiffs' eligibility related to the discrimination issue, then any appeal the Defendant files could easily be moot by the time it is before an appellate court. On the other hand, if the Court does not direct immediate disbursement of the PPP funds, and the Defendant files an appeal and obtains a stay pending appeal, then the Plaintiffs will not likely be able to disburse the funds in time to qualify for forgiveness, under the CARES Act requirements. Although this issue was debated at the oral arguments, the parties were not able to offer any language that would protect all of their interests at that time, and have not presented any compromise for dealing with this apparent irreconcilable difference with respect to the schedule for implementing the PPP process here, subsequent to that hearing.

The Plaintiffs request asks that the Court impose a temporal fiction with regard to implementing the PPP requirements, to allow them to satisfy the timing requirements to qualify for forgiveness without the funds actually being disbursed until a future date – which, presumably, could be after a final order is no longer subject to appeal. While this approach is rather unconventional, the Court finds it is the most effective way to balance the risks to, and protect the rights of, the Plaintiffs, Defendant, and Mascoma.

Based on the foregoing findings and conclusions, the Court will convert the temporary relief granted in the Second TROs to a permanent injunction, with additional safeguards for Mascoma and the Defendant.

### **CONCLUSION**

Based on the record in the Plaintiffs' chapter 11 bankruptcy cases and in these adversary proceedings, including the parties' arguments at the June 10, 2020 hearing, the Court finds there are no material facts in dispute with respect to the Plaintiffs' § 525(a) claims or the Plaintiffs' request for a permanent injunction, the Plaintiffs are entitled to judgment as a matter of law on their § 525(a) claims, and a permanent injunction is warranted, on the terms more fully described in the accompanying order.

This memorandum of decision constitutes the Court's findings of fact and conclusions of law. [17]

June 22, 2020                                                Colleen A. Brown
Burlington, Vermont                                         United States Bankruptcy Judge

---

[17] The Court has considered all of the parties' arguments and, to the extent not specifically addressed herein, finds them to be without merit.